Adrian **ELLIS**, Petitioner,

v.

**UNITED STATES of America,**
**Respondent.**

No. 10 Civ. 4017(BMC).

United States District Court,
E.D. New York.

June 3, 2011.

Andrian Ellis, York, PA, Plaintiff pro se.

William David Sarratt, Assistant United States Attorney, U.S. Attorneys Office, Eastern District of New York, for Defendant.

### MEMORANDUM DECISION AND ORDER

COGAN, District Judge.

This case is before me on petitioner's petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The petition is DENIED and the case is dismissed.

### BACKGROUND

**I. Charged Conduct**

In June 1992, Amarley Ellis, petitioner's sister, stole two Social Security checks, each valued at $5,742, from Yolanda Hosten's mail. Then, with the help of a third-party, Amarley opened two false savings accounts in Hosten's name and deposited the stolen checks. Amarley gradually withdrew the majority of the money and gave petitioner an unspecified amount.

Sometime in 1993, Hosten received a W–2 income tax statement, which indicated that she had received $11,484 in social security benefits. Hosten informed the Social Security Administration that she never received those benefits. Hosten also confronted Amarley about the checks on multiple occasions because she believed Amarley or one of the Ellis children were involved in their theft (Hosten lived in a basement apartment in the same residence as Amarley). Initially, Amarley denied any knowledge of the checks; however, she eventually told Hosten that, although she did not personally steal them, she

knew who did. Amarley assured Hosten that she would be repaid.

Amarley then decided that she had to murder Hosten and her nine-year old daughter in order to avoid being sent to jail, and she enlisted petitioner's help. In February 1993, petitioner forced entry into Hosten's apartment using an antique gun. Petitioner bound and gagged Hosten and her daughter (with Amarley's assistance). He first tried to suffocate Hosten and her daughter by wrapping their heads with Saran Wrap. Petitioner and Amarley also tried to smother Hosten's daughter by putting a pillow over her face.

Some time passed, and neither Hosten nor her daughter died. It eventually became evident that the Saran Wrap was not enough to suffocate Hosten or her daughter; Amarley therefore instructed petitioner to wrap an electrical cord around Hosten's neck and to pull one end of the cord while she pulled the other end. Petitioner and Amarley strangled Hosten to death; Hosten's daughter was nearby at the time. Petitioner then strangled Hosten's daughter to death.

After murdering Hosten and her daughter, petitioner and Amarley left the apartment. They did not return for two days. Upon returning, petitioner and Amarley wrapped Hosten's daughter's body in a sheet. They then severed her legs and transported her to an alley. They returned to the apartment, wrapped Hosten's body in a sheet, and transported her to the same alley (there is no evidence that petitioner and Amarley dismembered Hosten's body). There, petitioner set both bodies on fire.

Afterwards, petitioner and Amarley returned to Hosten's apartment to destroy evidence. Specifically, Amarley took Hosten's purse because there was a letter inside in which Amarley promised to repay Hosten the $11,484.

Petitioner was eventually charged in a four-count superseding indictment. The first three counts charged petitioner with conspiring to kill and intentionally killing Hosten and her daughter to prevent them from communicating information to law enforcement officers relating to the commission of federal crimes (*i.e.*, Amarley's theft of Hosten's Social Security checks and Amarley's act of opening a fraudulent bank account). *See* 18 U.S.C. § 1512(a)(1)(C). The fourth count charged petitioner with accessory after the fact for his role in attempting to cover up the murders. *See* 18 U.S.C. § 3.

## II. Petitioner's Guilty Plea

On April 3, 1997, pursuant to a plea agreement with the Government, petitioner pleaded guilty to count four of the superseding indictment—accessory after the fact. The plea agreement indicated that deportation was a "possible" penalty of the charge. At his plea hearing, Judge Raggi inquired about petitioner's citizenship status. Petitioner informed the Court that he was a citizen of Jamaica. Judge Raggi then stated: "Because you are not a United States citizen, I must tell you if you plead guilty to this charge that can be grounds for Immigration authorities deporting you, that is forcing you to leave this country after you serve any jail sentence." Judge Raggi asked petitioner if he understood that this was "a possible consequence of [his] guilty plea," and petitioner responded: "Yes, your Honor."

At the hearing, petitioner allocuted to the charged crime. Specifically, petitioner admitted that he assisted Amarley by driving the vehicle that contained Hosten and her daughter's bodies and by helping her dump those bodies. Petitioner admitted that he knew Amarley had participated in the murder of Hosten and her daughter.

Although petitioner claimed that he did not know Amarley had murdered them specifically because of her concern that they might implicate her in federal crimes, his attorney admitted that there was "[n]o question ... that [this was a federal homicide felony]." Petitioner also admitted that he knew he was helping Amarley avoid prosecution when he helped her dispose of Hosten and her daughter's bodies. Finally, petitioner admitted that he helped set the bodies on fire.

After pleading guilty, petitioner claims that he spoke with his attorney about withdrawing his plea because he feared being deported. Petitioner's attorney, he alleges, reassured him that he had nothing to worry about "because his conviction [for obstruction of justice was] not an 'aggravated felony.'" Moreover, petitioner further alleges that his attorney told him that his long-time residence in the United States "would factor in him not being deported."

### III.   Sentencing

Petitioner was sentenced, along with Amarley, on June 13, 1997. Judge Raggi stated that even though the Government allowed petitioner to plead to the lesser accessory after the fact offense, it took the position that petitioner was involved in the murders "step by step."[1] She told petitioner that his participation in the actual murders, as detailed in the presentence report, "may very well prompt an upward departure" to his Sentencing Guidelines. She therefore made a point to determine whether petitioner wished to challenge any of the factual statements contained in his presentence report despite the fact that he initially declined to make any such challenges.

After conferring with his attorney, petitioner informed Judge Raggi that he challenged the presentence report to the extent that it was inconsistent with his plea allocution—*i.e.*, he claimed that he was only involved in the murders after the fact and had no role in their commission. Accordingly, he requested a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir.1978). Judge Raggi scheduled a date for the hearing and was prepared to adjourn sentencing. Petitioner's attorney, however, requested five minutes to speak with his client.

During their off-the-record consultation, petitioner's attorney advised him that he faced a maximum 15–year sentence if he pleaded guilty to accessory after the fact. Based on that information, petitioner withdrew his objections to the presentence report. Judge Raggi asked petitioner if he understood that this meant she would assume, for purposes of sentencing, that he played an active role in the murders; petitioner answered affirmatively. Judge Raggi then asked petitioner if he wanted a hearing on this matter; petitioner answered, "No."

Thereafter, Judge Raggi asked the Government about petitioner and Amarley's immigration status. The Government informed the Court that both were resident aliens. Judge Raggi asked if they would "be subject to deportation after they serve[d] any sentence." She immediately noted that she was specifically concerned about petitioner's status. The Government responded that it depended on whether Immigration looked beyond the conviction to the substance of the offense. If, the Government surmised, Immigration considered the substance of the offense, it would deem the offense "a violent crime" and petitioner would therefore be a priori-

---

1.   Apparently, the Government agreed to the plea agreement because it thought Amarley, who had agreed to cooperate, had credibility

issues. Specifically, Amarley had lied to law enforcement officials throughout the investigation prior to admitting her guilt.

ty for deportation. Judge Raggi asked if "anybody wish[ed] to be heard any further," and petitioner's attorney responded, "No."

Judge Raggi then proceeded to sentence petitioner and Amarley. She found that their actions were "perplexing" and "incomprehensible." She also noted that petitioner was "smirking" and "rolling his eyes" during the sentencing proceeding, including when Hosten's other daughter gave a victim statement about the devastating effect petitioner and Amarley's actions had on her and her family. According to Judge Raggi, "no sentence . . . [was] severe enough for the conduct [petitioner] committed." Thus, she sentenced him to 15–years' imprisonment, the maximum sentence he faced (this required an upward departure of six offense levels, which Judge Raggi considered appropriate). Finally, she gave "the strongest possible recommendation that [petitioner] be immediately deported from this country after [he] serve[d][his] jail sentence." [2]

## IV. Post–Sentencing

Petitioner appealed his sentence. New appellate counsel moved to withdraw pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). The Second Circuit granted counsel's *Anders* motion and the Government's motion for summary affirmance. Petitioner did not seek Supreme Court review.

Petitioner has served his entire sentence. He is currently in the custody of Immigration and Customs Enforcement. Immigration held expedited proceedings to remove petitioner from the United States to Jamaica. On February 15, 2011, petitioner was ordered removed.

Petitioner's trial counsel passed away at some point prior to the filing of the instant petition, and thus there can be no evidence to contradict petitioner's version of his discussions with his attorney. The exact date of counsel's death is not specified in the record.

## V. Petitioner's § 2255 Petition

On August 31, 2010, petitioner filed a petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In his § 2255 petition, petitioner alleges four acts of misconduct on the part of his trial counsel that he claims entitles him to habeas relief. Specifically, petitioner claims that his attorney was constitutionally deficient because he: (1) failed to inform petitioner that his guilty plea made him subject to automatic deportation; (2) misled him into thinking that he had committed a federal crime; (3) failed to investigate the factual statements contained in the presentence report, failed to inform petitioner that there were documents that changed the report, allowed suppressed evidence to remain as factual statements in the report, and advised petitioner to waive a *Fatico* hearing; and (4) abandoned petitioner and severed communications with him immediately after sentencing. The Government opposes petitioner's § 2255 petition on timeliness grounds and on the merits.

## DISCUSSION

## I. Statute of Limitations

"The Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA') had among

---

**2.** Amarley was charged with one count of conspiring to kill Hosten and her daughter, one count of tampering with a witness (resulting in death), and one count of bank fraud. She pleaded guilty to all three counts and was sentenced along with petitioner. According to the sentencing transcript, Judge Raggi sentenced Amarley to five years' imprisonment on count one, life imprisonment on count two, and 30 years' imprisonment on count three (to run concurrently with one another). She also recommended that Amarley be immediately deported if she is ever released.

its goals 'to prevent undue delays in federal habeas review.' " *Wims v. United States,* 225 F.3d 186, 189 (2d Cir.2000) (quoting *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000) (*per curiam* )). It therefore "imposed a one-year statute of limitations [for § 2255 petitions], whereas previously habeas relief from a federal conviction could be sought 'at any time.' " *Id.* Pursuant to the AEDPA, the statute of limitations begins to run from the later of four dates, three of which are relevant here:

> (1) the date on which the judgment of conviction becomes final; ... (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

### A. *Final Judgment of Conviction*

■ The Second Circuit granted petitioner's appellate counsel's *Anders* motion and the Government's motion for summary affirmance on December 30, 1997. Petitioner did not file a petition for writ of certiorari. Thus, his judgment of conviction became final on March 30, 1998, when his time for seeking Supreme Court review expired. *See Clay v. United States,* 537 U.S. 522, 525, 123 S.Ct. 1072, 155 L.Ed.2d 88 (2003); *see also* Rule 13(1) of the Rules of the Supreme Court of the United States. Because petitioner filed his § 2255 petition on August 31, 2010, more than twelve years after his judgment of conviction became final, his petition is untimely under § 2255(f)(1).

### B. *Newly Discovered Facts*

■ Under § 2255(f)(4), the one-year statute of limitations begins to run "when a duly diligent person in petitioner's circumstances would have discovered" the facts supporting a particular claim. *Wims,* 225 F.3d at 190. Petitioner asserts that he did not learn of the facts supporting his third ground for relief until April 2010, when he received a copy of his presentence report as part of his deportation proceedings. Petitioner's third ground for relief alleges that his attorney was constitutionally deficient for four reasons: he (a) failed to investigate the factual statements contained in the presentence report; (b) failed to inform petitioner that there were documents that changed the report; (c) allowed suppressed evidence to remain as factual statements in the report; and (d) advised petitioner to waive a *Fatico* hearing.

Nothing contained in the presentence report, however, actually led petitioner to discover that his attorney failed to investigate the factual statements contained therein or that his counsel erroneously advised him to waive a *Fatico* hearing. Moreover, petitioner has not offered any explanation as to why he waited over twelve years to review a copy of his presentence report. *See Gacko v. United States,* No. 09–CV–4938, 2010 WL 2076020, at *2–3, 2010 U.S. Dist. LEXIS 50617, at *5–6 (E.D.N.Y. May 20, 2010) (placing burden of showing due diligence on petitioner). I find, as a matter of law, that a diligent person in petitioner's circumstances would have reviewed his presentence report years before April 2010. On its own, petitioner's unexplained decade-long delay would be sufficient to support this holding. Petitioner's delay here is particularly inexcusable under the due diligence standard in light of Judge Raggi's comments at sentencing, where she stressed to petitioner that the factual

statements in the presentence report played an important role in her decision to sentence him to 15–years' imprisonment (the maximum sentence allowed). Thus, petitioner cannot take advantage of § 2255(f)(4).

### C. *Retroactive Application of a Newly Recognized Right*

Petitioner's first ground for relief asserts that his attorney was constitutionally defective for failing to inform him that his guilty plea made him subject to automatic deportation. According to petitioner, this ground is timely under § 2255(f)(3) because the Supreme Court recognized a new right in *Padilla v. Kentucky*, —— U.S. ——, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), that right is retroactively applicable to cases on collateral review, and he filed his petition within one year after the Court decided *Padilla*. The Government contends that *Padilla* does not apply retroactively and that petitioner therefore cannot take advantage of § 2253(f)(3).[3]

### 1. *Padilla v. Kentucky*

In *Padilla*, Jose Padilla, a lawful permanent resident of the United States, pleaded guilty to transporting marijuana and, as a result, faced automatic deportation to his native Honduras. Padilla, seeking post-conviction relief in Kentucky state court, claimed that his counsel was constitutionally defective for failing to advise him that his deportation was virtually mandated by his guilty plea and for advising him that he "did not have to worry about immigration status since he had been in the country for [over 40 years]." *Id.* at 1478. The Supreme Court of Kentucky denied Padilla relief, holding "that the Sixth Amendment's guarantee of effective assistance of counsel [did] not protect a criminal defen-

dant from erroneous advice about deportation because [deportation] is merely a 'collateral' consequence of [a] conviction." *Id.*

The Supreme Court granted certiorari and reversed. It acknowledged that a number of federal and state courts, like the Supreme Court of Kentucky, had held that "collateral consequences are outside the scope of representation required by the Sixth Amendment." *Id.* at 1481; *see also id.* at 1481 n. 9 (collecting cases). The Supreme Court, however, had never applied such a distinction, and it declined to reach the issue in *Padilla* "because of the unique nature of deportation." *Id.* at 1481. Specifically, the Court stressed that it has "long recognized" deportation as a "particularly severe penalty." *Id.* (internal quotation marks omitted) (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 740, 13 S.Ct. 1016, 37 L.Ed. 905 (1893)). Moreover, despite the fact that deportation is a civil proceeding, the Court stated that it is "intimately related to the criminal process" because "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century." *Id.* Accordingly, the Court concluded that, notwithstanding the legitimacy of any direct versus collateral distinction, "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel" and that "*Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] applie[d] to Padilla's claim." *Id.* at 1482.

The Court, applying *Strickland's* first prong, then analyzed "whether counsel's representation 'fell below an objective standard of reasonableness.' " *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). Here, the Court began by noting

**3.** The Government assumes that the *Padilla* Court announced a new right. For purposes of this motion, I have done the same.

that this inquiry "is necessarily linked to the practice and expectations of the legal community." *Id.* With that in mind, the Court restated its long-held belief "that prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable." *Id.* (internal quotation marks, brackets, ellipses, and citations omitted). It then cited a number of treatises, bar publications, and law review articles, and concluded that "[t]he weight of prevailing professional norms support[s] the view that counsel must advise [his] client regarding the risk of deportation." *Id.* at 1482–83. It also discussed *INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), in which it had recognized the importance of advising clients regarding certain immigration consequences of criminal proceedings. Based on this, the Court held that criminal defense attorneys have a constitutional duty to advise their noncitizen clients on the immigration consequences of convictions.

Finally, the Court elaborated on the extent of the right it recognized. It refused to ground its holding solely on the basis of Padilla's allegation that his counsel provided him with incorrect advice about his likelihood of being deporting. Rather, the Court held that criminal defense attorneys have an affirmative duty to provide their noncitizen clients with some level of advice regarding the immigration consequences of convictions. The scope of this duty depends on the complexities of a particular case. If, for example, "the law [surrounding the deportation consequences of a conviction] is not succinct and straightforward

... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla,* 130 S.Ct. at 1483. If, however, "deportation consequence[s][are] truly clear," criminal defense attorneys must give their noncitizen clients correct advice about those consequences. *Id.* Because it was clear that Padilla's conviction subjected him to almost certain deportation, the Court held that his attorney's erroneous advice satisfied *Strickland's* first prong.[4]

## 2. Retroactive Application

In *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), a plurality of the Court set forth the test for determining whether a prior holding announced a new rule and, if so, whether that rule was to be applied retroactively on a federal collateral attack of a state court conviction.[5] The Second Circuit has applied *Teague* and its progeny when deciding whether § 2255(f)(3) is applicable on a § 2255 petition. *See Coleman v. United States,* 329 F.3d 77 (2d Cir.2003).

■ Under the *Teague* line of cases, the Supreme Court divides newly recognized criminal rules into two categories: substantive and procedural. *See Schriro v. Summerlin,* 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). Generally, new substantive rules apply retroactively on collateral review. Substantive rules include rules that (1) "narrow the scope of a criminal statute by interpreting its terms," *id.* at 351–52, 124 S.Ct. 2519 (internal citations omitted); (2) "forbid[ ] punishment of

---

4. The Court did not determine whether, under *Strickland's* second prong, petitioner demonstrated prejudice because the courts below did not reach that issue.

5. The framework utilized by the plurality in *Teague* has since been adopted by the Court.

*See, e.g., Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007); *Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004); *Schriro v. Summerlin,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

certain primary conduct;" or (3) "prohibit[ ] a certain category of punishment for a class of defendants because of their status or offense," *Beard v. Banks*, 542 U.S. 406, 417, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (internal quotation marks and citations omitted).[6]

In contrast, "[n]ew rules of procedure ... generally do not apply retroactively" because they "merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519, 159 L.Ed.2d 442.[7] There is, however, one exception to this general bar: the Court will "give retroactive effect to ... a small set of watershed rules of criminal procedure." *Id.* (internal quotation marks omitted). "In order to qualify as watershed, a new rule must meet two requirements. First, the rule must be necessary to prevent an impermissibly large risk of an inaccurate conviction. Second, the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." *Whorton v. Bockting*, 549 U.S. 406, 418, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). According to the Court, "[t]his class of rules is extremely narrow, and it is unlikely that any has yet to emerge." *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519 (internal quotation marks, ellipses, brackets, and citations omitted).

In *Padilla*, the Court did not narrow the scope of a criminal statute, forbid punishing defendants for certain primary conduct, or prohibit punishing a class of defendants because of their status or offense. Rather, it held that the Sixth Amendment requires criminal defense attorneys to provide their noncitizen clients with certain advice regarding the immigration consequences of convictions. This rule merely raises the possibility that a noncitizen defendant who pleaded guilty without being informed of those consequences would have refused to enter such a plea had he known of them. Thus, the Court announced a new rule of criminal procedure, not a new rule of substantive law. *See Hamad v. United States*, No. 10 Civ. 5829, 2011 WL 1626530, at *1–2, 2011 U.S. Dist. LEXIS 45851, at *5–6 (E.D.N.Y. Apr. 28, 2011) (assuming *Padilla* announced a new rule and holding that it is procedural).

The rule announced in *Padilla* will therefore only be applied retroactively if it qualifies as a watershed rule. Since recognizing the watershed exception in *Teague*, the Court has yet to hold that a newly announced rule of criminal procedure meets its stringent requirements. *See, e.g., Beard*, 542 U.S. at 417, 124 S.Ct. 2504. As an example of the type of procedural rule that would warrant retroactive application under this exception, the Court has repeatedly referred to *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9

---

**6.** The Supreme Court initially referred to the second and third categories of substantive rules as procedural rules that are given retroactive effect on collateral review notwithstanding the general bar on retroactive application of newly recognized procedural rules. *See Horn v. Banks*, 536 U.S. 266, 271 & n. 5, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (*per curiam*). More recently, however, the Court has noted that these categories "are more accurately characterized as substantive rules." *Schriro*, 542 U.S. at 352 n. 4, 124

S.Ct. 2519, 159 L.Ed.2d 442; *see also Beard*, 542 U.S. at 411 n. 3, 417 n. 7, 124 S.Ct. 2504, 159 L.Ed.2d 494.

**7.** The Court treats new substantive rules and new procedural rules differently for retroactivity purposes because new procedural rules, unlike new substantive rules, do not "produce a class of persons convicted of conduct the law does not make criminal." *Schriro*, 542 U.S. at 352, 124 S.Ct. 2519.

L.Ed.2d 799 (1963), in which it held that states must provide indigent criminal defendants with court-appointed counsel. *See, e.g., Beard,* 542 U.S. at 417, 124 S.Ct. 2504. In using *Gideon* as the benchmark for watershed rules, the Court has focused on that case's profound, sweeping, and fundamental impact on criminal proceedings. *See Whorton,* 549 U.S. at 421, 127 S.Ct. 1173; *Beard,* 542 U.S. at 419–20, 124 S.Ct. 2504; *Saffle v. Parks,* 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

When compared to *Gideon,* it is clear that the rule announced in *Padilla* falls far short of the type of watershed procedural rule that is applied retroactively on collateral review. First, the rule has nothing to do with the accuracy of a defendant's conviction. The Court was concerned with noncitizen defendants making informed decisions about whether to enter a guilty plea or proceed to trial. The rule is therefore designed to ensure that attorneys advise these defendants about the deportation consequences of the charges they face, not to ensure that defendants convicted of crimes are, in fact, guilty.

■■■ Second, the *Padilla* rule does not "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer v. Smith,* 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (internal quotation marks omitted). Notably, "this requirement cannot be met simply by showing that a new procedural rule is *based on* a 'bedrock' right [because] ... the *Teague* bar to retroactivity applies to new rules that are based on 'bedrock' constitutional rights." *Whorton,* 549 U.S. at 420–21, 127 S.Ct. 1173 (citing *Beard,* 542 U.S. at 418, 124 S.Ct. 2504). Thus, "in order to meet this requirement, a new rule must *itself* constitute a previously unrecognized bedrock procedural element that is essential

to the fairness of a proceeding." *Id.* (emphasis added).

The rule announced in *Padilla* is based on the Sixth Amendment's right to effective assistance of counsel as interpreted by *Strickland.* It is a relatively narrow holding that interprets *Strickland* in a new context and merely announces a previously unrecognized standard that criminal defense attorneys must meet in order to provide noncitizen defendants with constitutionally adequate representation. Moreover, it only applies to a limited class of defendants—noncitizen defendants who face charges that carry with them immigration consequences. *See United States v. Mandanici,* 205 F.3d 519, 528 (2d Cir. 2000) ("[To be watershed, a rule] must be a 'groundbreaking occurrence,' a 'sweeping' change that applies to a large swathe of cases rather than a 'narrow right' that applies only to a 'limited class' of cases," (quoting *Caspari v. Bohlen,* 510 U.S. 383, 396, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) and *O'Dell v. Netherland,* 521 U.S. 151, 167, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997))). This rule is neither profound nor sweeping, nor does it have a fundamental impact on criminal proceedings generally. I therefore find that the rule announced in *Padilla* does not apply retroactively. Accordingly, petitioner is unable to take advantage of the § 2255(f)(3) accrual date for his first ground for relief.

In so holding, I reject petitioner's argument that the *Padilla* decision itself indicates that the rule it announced is to be applied retroactively. In support of this argument, petitioner cites the following passage from the majority opinion:

We have given serious consideration to the concerns that the Solicitor General, respondent, and *amici* have stressed regarding the importance of protecting the finality of convictions obtained through guilty pleas. We confronted a similar

"floodgates" concern in *Hill* [*v. Lockhart* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)], but nevertheless applied *Strickland* to a claim that counsel had failed to advise the client regarding his parole eligibility before he pleaded guilty.

*Padilla,* 130 S.Ct. at 1484–85. Relying on this passage, some courts have adopted petitioner's argument and have held that *Padilla* applies retroactively. *See United States v. Hubenig,* No. 03–mj–040, 2010 WL 2650625, at *7, 2010 U.S. Dist. LEXIS 80179, at *20 (E.D.Cal. July 1, 2010) ("If the Court intended *Padilla* to be a new rule which would apply only prospectively, the entire 'floodgates' discussion would have been unnecessary.").

I am not convinced by this rationale. First, simply relying on the "floodgates" discussion ignores the *Teague* framework for determining whether new rules are applicable retroactively. Second, the majority's discussion of "floodgate" concerns in no way indicates that it intended its holding to be applied retroactively. Rather than being concerned about defendants flooding the courts with challenges to convictions that are already final, I believe the Court was discussing prospective defendants who will plead guilty in the future and then subsequently seek to challenge those guilty pleas under *Padilla.* Thus, nothing in the *Padilla* opinion indicates that its holding is to be applied retroactively.

## II. Merits

Because I have found that all of petitioner's grounds for relief are untimely under § 2255(f), I do not need to reach the merits of his petition. Even if I were to conclude that petitioner's claims were timely, however, I would still deny his petition. The petition raises four ineffective assistance of counsel claims. In order to make out a claim of ineffective assistance of counsel, petitioner must demonstrate (1) that his attorney's representation fell below an objective standard of reasonableness and (2) that he was prejudiced as a result. *See Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A. *Failure to Inform Petitioner about Immigration Consequences*

Prior to pleading guilty, petitioner claims to have asked his attorney about the immigration consequences of his plea. According to petitioner, his attorney responded: "Don't worry about being deported, you have been a resident since the age of three, [the United States Immigration and Naturalization Service] will take that into account and won't deport you." Then, during his plea hearing, Judge Raggi informed petitioner of the following: "Because you are not a United States citizen, I must tell you if you plead guilty to this charge that can be grounds for Immigration authorities deporting you, that is forcing you to leave this country after you serve any jail sentence." Petitioner acknowledged to Judge Raggi that he understood deportation was a possible consequence of his guilty plea.

Petitioner claims that after pleading guilty, he contacted his attorney about withdrawing his plea because he feared being deported. According to petitioner, his counsel reassured him that he should not worry about being deported "because his conviction [for obstruction of justice] is not an 'aggravated felony'" and because his long-time residence in the United States "would factor in him not being deported."

Had he been properly informed of the immigration consequences of his guilty plea, petitioner claims he would have opted to stand for trial rather than plead guilty

to accessory after the fact. Moreover, petitioner claims that his attorney should have known how important remaining in the United States was to him because his attorney knew he "lacked knowledge of his [native Jamaica]" and felt a strong connection to the United States due to his long-term residency here.

■■■■ As discussed above, under *Padilla*, the scope of a criminal defense attorney's obligation to provide advice regarding the immigration consequences of a guilty plea depends on the complexities of those consequences. Briefly restated, "[w]hen the law is not succinct and straightforward ... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 130 S.Ct. at 1483. If, however, "deportation consequence[s][are] truly clear," criminal defense attorneys must give their noncitizen clients correct advice about those consequences. *Id.*

■■■■ The issue before me then is whether, on April 3, 1997 (when petitioner pleaded guilty), the law was clear that petitioner's conviction for accessory after the fact would result in automatic deportation. In 1988, Congress amended the immigration laws and made noncitizens subject to deportation if they were convicted of any "aggravated felony." Anti–Drug Abuse Act of 1988, Pub. L. No. 100–690, 102 Stat. 4181, 4470–71, §§ 7343, 7344; *see also St. Cyr*, 533 U.S. at 295, 121 S.Ct. 2271. Then, in 1996, Congress amended the definition of "aggravated felony" to include "offense[s] relating to obstruction of justice." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, 110 Stat. 1214, 1278,

§ 440(e)(8)(S) (codified as amended at 8 U.S.C. § 1101(a)(43)(S)).[8] Moreover, noncitizens convicted of aggravated felonies were not subject to discretionary relief from deportation. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, 110 Stat. 3009, 594, § 240A(a)(3) (codified as amended at 8 U.S.C. § 1229b(a)(3)); *see also* 110 Stat. at 1280, § 442(c) (codified as amended at 8 U.S.C. § 1228(c)) ("An alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States."). Thus, by the time petitioner entered his guilty plea, a noncitizen convicted of an "aggravated felony," including an offense related to obstruction of justice, was subject to automatic deportation.

At that time, however, neither the Board of Immigration Appeals ("BIA") nor the federal courts had held that accessory after the fact was an offense related to obstruction of justice or was otherwise considered an aggravated felony. Of course, the absence of a reported case holding that the offense of accessory after the fact relates to obstruction of justice does not necessarily compel the conclusion that the law on this issue was unclear. There are, however, several factors present here that support this conclusion.

First, the immigration laws do not define the term "offense relating to obstruction of justice." Thus, in advising petitioner on whether his guilty plea would subject him to automatic deportation, petitioner's attorney had to determine which offenses Congress intended to include as "obstruction of justice" offenses and then analyze whether petitioner's accessory after the fact conviction related to those offenses. Here, the natural starting point for an objectively reasonable attorney would have

---

**8.** The AEDPA made this new definition of "aggravated felony" applicable retroactively.

*See* 110 Stat. at 1278, § 440(f) (codified as amended at 8 U.S.C. § 1101(a)(43)).

been Chapter 73 of Title 18 of the United States Code because that Chapter codifies offenses involving "Obstruction of Justice." *See* 18 U.S.C. § 1501 *et seq.* Accessory after the fact is not codified in Chapter 73; rather, it is codified in Chapter 1 of Title 18 of the United States Code (titled "General Provisions"). *See* 18 U.S.C. § 3. Because accessory after the fact is not codified as an "Obstruction of Justice" offense under the United States Code, it does not fall within the ambit of 8 U.S.C. § 1101(a)(43)(S) unless it relates to obstruction of justice.

Second, whether the offense of accessory after the fact relates to obstruction of justice is a complicated issue subject to multiple interpretations. Even today, there is a split among the Circuits. Less than one month ago, a divided panel of the Ninth Circuit held that a state conviction under Washington's "[r]endering criminal assistance" statute is not an offense related to obstruction of justice. *See Hoang v. Holder*, 641 F.3d 1157, 1165 (9th Cir. 2011).[9] In so holding, the majority reversed the BIA's unpublished, one-member order, which upheld the Immigration Judge's decision to remove Hoang to Vietnam.

According to the BIA, the state statute and the federal accessory after the fact statute have the same elements. Because the BIA had previously ruled that a conviction under the federal accessory after the fact statute "clearly relates to obstruction of justice," *In re Batista–Hernandez*, 21 I. & N. Dec. 955, 962 (B.I.A.1997), it

held here that Hoang's conviction under Washington's identical state statute likewise qualified as an offense relating to obstruction of justice. The BIA decided *In re Batista–Hernandez* on July 15, 1997, almost three months after petitioner pleaded guilty and one month after he was sentenced.

The Ninth Circuit's majority opinion proceeded in two parts. First, applying the categorical approach established in *Taylor v. United States,* 495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990), it "compare[d] the elements of the statute of conviction with the federal definition of [obstruction of justice] to determine whether the state statute is broader than the generic federal definition." *Hoang,* 641 F.3d at 1159–60 (internal quotation marks, citation, and brackets omitted). Because the majority found the phrase "offense relating to obstruction of justice" ambiguous, it deferred to the BIA's interpretation of the generic federal obstruction of justice offense. Accordingly, the majority held that the generic federal obstruction of justice offense has two elements: a defendant must (1) "either [ (a) ] active[ly] interfer[e] with proceedings of a tribunal or investigation, or [ (b) ] act[ ] or threat[en] ... action against those who would cooperate with the process of justice; and ... [ (2) ] specific[ally] inten[d] to interfere with the process of justice." *Id.* at 1161 (internal quotation marks omitted); *see also In re Espinoza–Gonzalez,* 22 I. & N. Dec. 889, 892–93 (B.I.A.1999).

---

**9.** The state statute tracks the language of the federal accessory after the fact statute. It provides, in relevant part: "A person is guilty of rendering criminal assistance in the second degree if he or she renders criminal assistance to a person who has committed or is being sought for a class B or class C felony." Wash. Rev.Code § 9A.76.080; *see also id.* § 9A.76.050 ("[A] person 'renders criminal

assistance' if, with intent to prevent, hinder, or delay the apprehension or prosecution of another person who he knows has committed a crime or juvenile offense or is being sought by law enforcement officials for the commission of a crime or juvenile offense or has escaped from a detention facility," he commits one of six enumerated acts.).

Relying on its plain language, the majority then found that the state statute has three elements:

[A] [d]efendant must (1) have the "intent to prevent, hinder or delay the apprehension or prosecution of another person"; (2) "know the person has committed a crime or juvenile offense or is being sought by law enforcement officials for the commission of a crime or juvenile offense"; and (3) commit one of the statutorily enumerated acts [contained in Wash. Rev.Code § 9A.76.050].

*Hoang,* 641 F.3d at 1162 (quoting Wash. Rev.Code § 9A.76.050). A defendant could be guilty of the state statute without "commit[ting] an act involving either active interference with *proceedings of a tribunal or investigation,* or action or threat of action against those who would cooperate with the process of justice." *Id.* at 1161–62. Thus, the majority found that the state statute did not satisfy the elements of the generic federal obstruction of justice offense and that, under the categorical approach, it was not an offense relating to obstruction of justice. *Id.* at 1161–63.

Before moving on to the second part of its decision, the majority discussed *In re Batista–Hernandez.* It acknowledged that the BIA did not overrule *In re Batista–Hernandez* with its decision in *In re Espinoza–Gonzalez* and that the state statute at issue had the same elements as the federal accessory after the fact statute. It, however, concluded that the latter case partially abrogated the former. According to the majority, after *In re Espinoza–Gonzalez,* a conviction for accessory after the fact is no longer clearly related to obstruction of justice. Rather, such a conviction is only related to obstruction of justice if "it interferes with an *ongoing* proceeding or investigation." *Id.* at 1167 (emphasis added).

In the second part of its decision, the majority determined whether Hoang's state conviction otherwise qualified as an offense relating to obstruction of justice under the modified categorical approach. Here, the majority "conduct[ed] a limited examination of documents in the record of conviction to determine whether [Hoang] was necessarily convicted of all of the elements of the generic crime." *Id.* at 1165 (internal quotation marks and citations omitted). In the guilty plea context, these records generally include "the terms of the charging document, the terms of a plea agreement or transcript of the plea colloquy, or ... some comparable judicial record in which [Hoang] confirmed the factual basis for the plea." *Id.* at 1165 (internal quotation marks, ellipses, brackets, and citations omitted). The majority found that "[n]othing in the record of conviction establishe[d] that there was an ongoing investigation or tribunal at the time Hoang" engaged in the conduct that led to his conviction. *Id.* at 1165. Thus, the majority held, Hoang was not convicted of an offense relating to obstruction of justice under the modified categorical approach.

Using the majority's analysis in *Hoang,* petitioner's conviction for accessory after the fact does not appear to be an offense relating to obstruction of justice. This is because a defendant could be convicted under the statute for engaging in conduct even though there was no ongoing proceeding or investigation at the time. Similarly, there is nothing in the record before me indicating that there was an ongoing proceeding or investigation when petitioner engaged in the conduct that led to his conviction. Thus, under the modified categorical approach, petitioner's conviction would still not relate to obstruction of justice.

In contrast, the Third Circuit has taken a much broader view of the contours of the phrase "offense relating to obstruction of justice." *See Denis v. Attorney Gen.,* 633

F.3d 201 (3d Cir.2011). In *Denis,* the court held that a conviction for tampering with physical evidence under New York law was an offense relating to obstruction of justice.[10] Like the Ninth Circuit, the court applied the categorical approach to determine whether the state statute constituted an aggravated felony. Unlike the Ninth Circuit, however, the court concluded that the phrase "relating to obstruction of justice" was unambiguous and therefore afforded the BIA's definition (as stated in *In re Espinoza–Gonzalez* ) no deference. According to the court, the phrase "relating to" "is ... read expansively and [is] not ... strictly confined to its narrowest meaning." *Id.* at 209 (internal quotation marks and citation omitted). The court agreed with the Ninth Circuit that *In re Espinoza–Gonzalez* requires a statute to have as one of its elements "either active interference with proceedings of a tribunal or investigation, or action or threat of action against those who would cooperate in the process of justice" in order to fall within the ambit of § 1101(a)(43)(S). *Id.* at 210 (quoting *In re Espinoza–Gonzalez,* 22 I. & N. Dec. at 892). The court, however, disregarded *In re Espinoza–Gonzalez's* interpretation, reasoning that it impermissibly read the phrase "relating to" out of the statute. *See id.* at 210–12; *see also* 8 U.S.C. § 1101(a)(43)(S).

Rather, to give full effect to the wording of § 1101(a)(43)(S), the court compared the state statute with the offenses codified in Chapter 73 to determine whether they had a "logical or causal connection." *Denis,* 633 F.3d at 212. The court found that this connection existed with 18 U.S.C. §§ 1503 and 1512(c). "Section 1503 contains a catchall provision prohibiting a person from 'corruptly or by threats or force, or by any threatening letter or communication, influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct or impede, the due administration of justice.' " *Id.* (quoting 18 U.S.C. § 1503). Because the state statute and § 1503, "by their terms, proscribe any behavior that entails the use of force in an effort to impede or obstruct an official proceeding," the court found that the state statute "bears a close resemblance to the federal obstruction of justice offense defined in Section 1503." *Id.* Moreover, § 1512(c) "prohibits in pertinent part alteration, destruction, mutilation, or concealment of any object that would 'impair the object's integrity or availability for use in an official proceeding.' " *Id.* at 213 (quoting 18 U.S.C. § 1512(c)). The court found that "[t]his subsection's focus on destroying or mutilating evidentiary items in anticipation of their potential production in a prospective proceeding is directly analogous, and thus, logically connected to Denis's state crime of conviction." *Id.* Accordingly, the court held that "Denis's offense 'relat[es] to obstruction of justice as that offense is defined in ... Sections 1512(c) and 1503.' " *Id.*

Using this broad approach to § 1101(a)(43)(S), it appears as if petitioner's accessory after the fact conviction would relate to obstruction of justice. There is a logical connection between petitioner's conviction for hindering or preventing Amarley's apprehension and § 1503's prohibition on corruptly obstructing or impeding the due administration of

---

**10.** The relevant portion of the statute provides: "A person is guilty of tampering with physical evidence when ... [b]elieving that certain physical evidence is about to be produced or used in an official proceeding or a prospective official proceeding, and intending to prevent such production or use, he suppresses it by any act of concealment, alteration or destruction, or by employing force, intimidation or deception against any person." N.Y. Penal Law § 215.40(2).

justice. The only difference between the two statutes is that § 1503 requires a nexus between the defendant's conduct and a *pending* judicial proceeding, *see United States v. Aguilar,* 515 U.S. 593, 599–600, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), while the accessory after the fact statute does not, *see* 18 U.S.C. § 3. Under the Third Circuit's approach, however, this minor procedural difference is not so severe that it breaks the causal connection between the two offenses. *See Denis,* 633 F.3d at 209 (noting that the phrase "relating to" "must be construed to encompass crimes other than those specifically listed in the federal statutes"). Thus, under *Denis,* petitioner's conviction would appear to relate to obstruction of justice.

*Hoang* and *Denis* both offer reasonable constructions of § 1101(a)(43)(S), and whether petitioner's conviction is properly classified as an offense related to obstruction of justice appears to depend on which approach is used. Petitioner's attorney did not, however, have the benefit of *Hoang* or *Denis's* analysis when he advised petitioner about the immigration consequences of his guilty plea, nor did he have the benefit of the BIA's decisions in *In re Batista–Hernandez* or *In re Espinoza–Gonzalez.* Rather, he only had the plain language of § 1101(a)(43)(S) and his own interpretation of analogous laws. Where, as here, jurists reach reasonable but contrary conclusions on the same issue, the law on that issue cannot be succinct and straightforward to an attorney until a controlling court provides him with clear guidance. Thus, I cannot find that it was clear, in April 1997, that petitioner's conviction for accessory after the fact would subject him to automatic deportation.[11]

Finally, and along similar lines, in his concurring opinion in *Padilla,* Justice Alito criticized the majority's approach of imposing an affirmative duty on criminal defense attorneys partly because "determining whether a particular crime is an 'aggravated felony' ... is not an easy task." *Padilla,* 130 S.Ct. at 1488 (Alito, J., concurring). Justice Alito, citing R. McWhirter, ABA, The Criminal Lawyer's Guide to Immigration Law: Questions and Answers (2d ed. 2006) [hereinafter the "Guidebook"], went through examples of the difficulties criminal defense attorneys face when determining whether a particular crime qualifies as an aggravated felony. In one set of examples quoted by Justice Alito, the Guidebook provides that a "conviction under the federal accessory after the fact statute is probably not an aggravated felony, but a conviction for accessory after the fact to the manufacture of methamphetamine is an aggravated felony." *Padilla,* 130 S.Ct. at 1489 (Alito, J., concurring) (quoting McWhirter, *supra* at 161 (internal quotation marks, brackets, and emphasis omitted)). This further demonstrates that whether petitioner's guilty plea subjected him to automatic deportation was a complicated question not readily capable of a succinct or straightforward answer.

I therefore hold that it was unclear, as of April 1997, whether petitioner's guilty plea to accessory after the fact subjected him to automatic deportation. In so holding, I do not rely solely on any of the factors I have just discussed. Rather, when viewed in their totality, these factors show that the law in this area was "not succinct and straightforward" at the time petitioner pleaded guilty. Thus, under *Padilla,* petitioner's attorney was only required to "advise [petitioner that his guilty

---

**11.** Second Circuit precedent interpreting a similar provision of § 1101(a)(43) appears more in line with the Third Circuit's interpretation. *See Kamagate v. Ashcroft,* 385 F.3d 144 (2d Cir.2004).

plea might have] carr[ied] a risk of adverse immigration consequences." *Padilla*, 130 S.Ct. at 1483. Because it is undisputed that petitioner knew he could potentially face adverse immigration consequences if he pleaded guilty to the accessory after the fact charge, he received the counsel mandated by *Padilla*.

According to petitioner's account, his attorney did more than merely advise him that he faced potential adverse immigration consequences; his attorney also advised him that he would not be deported because his conviction was not for an aggravated felony and because he was a long-time resident. Given the ambiguity surrounding this area of law at the time petitioner pleaded guilty, petitioner's attorney may have better served petitioner by giving him less definite advice about the immigration consequences of his conviction. The Sixth Amendment, however, only guarantees criminal defendants reasonably competent counsel; it does not guarantee them counsel with a crystal ball or even error free counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). Based on the foregoing discussion, it was objectively reasonable under *Strickland* for petitioner's attorney to conclude that petitioner's conviction for accessory after the fact was not an aggravated felony and that petitioner was not subject to automatic deportation, a position with which the Ninth Circuit would ultimately agree. Thus, I find that even though petitioner's attorney's advice proved to be incorrect, that advice did not fall below an objective standard of reasonableness. Petitioner is therefore unable to meet his burden under *Strickland's* first prong.

### B. *Existence of a Federal Crime*

▮▮▮▮ Petitioner's second ground for relief is that his attorney was ineffective for misleading him into thinking that he had committed a federal crime. This claim is without merit. The accessory after the fact offense "has the following elements: '(1) the commission of an underlying offense against the United States; (2) the defendant's knowledge of that offense; and (3) assistance by the defendant in order to prevent the apprehension, trial, or punishment of the offender.'" *United States v. Osborn*, 120 F.3d 59, 63 (7th Cir.1997) (quoting *United States v. Lepanto*, 817 F.2d 1463, 1467 (10th Cir.1987)). Here, Amarley committed federal crimes when she (1) stole Hosten's Social Security checks; (2) fraudulently deposited those checks in the bank accounts she and a third-party opened in Hosten's name; and (3) participated in the murder of Hosten and her daughter to prevent Hosten from communicating Amarley's first and second crimes to law enforcement. *See* 18 U.S.C. §§ 371, 1344, 1512(a)(1)(C).

Petitioner does not dispute Amarley's participation in any of those crimes. Moreover, petitioner does not dispute the statements he made during his plea allocution. Specifically, petitioner stated that he "assisted Amarley Ellis in driving the vehicle that contained two dead bodies of [Hosten and her daughter] and ... helped [Amarley] dump the bodies." Petitioner also admitted that he knew Amarley had participated in the murder of Hosten and her daughter and that he knew he was helping Amarley avoid prosecution by disposing of the bodies. Finally, petitioner admitted that he helped set Hosten and her daughter's bodies on fire. He therefore committed the federal crime of accessory after the fact and cannot show that his attorney's conduct fell below an objective standard of reasonableness or that he was prejudiced in any way. *See United States v. Arena*, 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless

argument does not amount to ineffective assistance.").

### C. *Claims Regarding Petitioner's Sentencing*

Petitioner's third ground for relief alleges that his attorney was ineffective for (a) failing to investigate the factual statements contained in the presentence report; (b) failing to inform petitioner that there were documents that changed the report; (c) allowing suppressed evidence to remain as factual statements in the report; and (d) advising petitioner to waive a *Fatico* hearing. All four of these claims are without merit.

▆ Petitioner has not demonstrated that any of the factual statements contained in the presentence report or in the additional documents were false. Similarly, he has not demonstrated that the Government would have failed to meet its burden of proving the factual statements contained in the presentence report. *See United States v. Ruggiero,* 100 F.3d 284, 290 (2d Cir.1996) (holding that the Government must prove disputed facts relevant to sentencing by a preponderance of the evidence). Thus, even assuming petitioner's attorney failed to investigate those statements, failed to inform him of the additional documents, erroneously advised him to waive a *Fatico* hearing, and that these failures fell below an objective level of reasonableness, petitioner has not shown prejudice.

Moreover, petitioner's claim that his attorney allowed suppressed evidence to remain in the presentence report is contrary to the record. The original presentence report included post-arrest statements petitioner made to law enforcement officers. Prior to pleading guilty, petitioner moved to suppress those statements; the Government conceded the motion. In a letter dated June 2, 1997, the Government wrote to Probation and requested that the suppressed statements be deleted from the presentence report. Pursuant to an addendum to the Presentence Report dated June 5, 1997, Probation incorporated the corrections contained in the Government's June 2, 1997 letter (including the request that the post-arrest statements be deleted). Contrary to petitioner's claim, the suppressed evidence was omitted from the final presentence report.

### D. *Claim of Abandonment*

Finally, petitioner claims that his attorney abandoned him immediately after sentencing and that this abandonment led Ellis to believe that he did not have an appeal or the ability to petition the Supreme Court for a writ of certiorari. Ellis was, however, appointed new counsel on appeal. His new appellate counsel filed an *Anders* motion seeking to withdraw, which the Second Circuit granted. Petitioner fails to demonstrate that he had any meritorious grounds for appeal or that he was otherwise prejudiced by his trial attorney's alleged abandonment or by his appellate attorney's withdrawal.

### CONCLUSION

The petition is denied as untimely or, alternatively, without merit, and the case is dismissed. Although there is some conflict in the cases over the retroactive impact of *Padilla,* and the Second Circuit has not yet weighed in on that issue, the alternative grounds for my decision demonstrate that petitioner has failed to make a substantial showing of the denial of a constitutional right. Thus, a certificate of appealability shall not issue. 28 U.S.C. § 2253. Further, I certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal.

*Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**SO ORDERED.**