*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-1509

JEAN-BAPTISTE BADO, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DVM-1930-11)

(Hon. Jennifer M. Anderson, Motions Judge)
(Hon. Stuart G. Nash, Trial Judge)

(Argued May 28, 2014                    Decided July 16, 2015)

*Paul V. Renaud III*, Student Attorney, D.C. Law Students in Court, with whom *Moses A. Cook* and *Alfred D. Carry* were on the brief, for appellant.

*Lauren R. Bates*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman, John P. Mannarino*, and *Michelle Parikh*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and RUIZ, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Concurring opinion by *Associate Judge* THOMPSON at page 30.

Concurring opinion by *Senior Judge* RUIZ at page 35.

Dissenting opinion by *Associate Judge* FISHER at page 46.

THOMPSON, *Associate Judge*:   This appeal requires us to decide whether a non-citizen facing a charge of misdemeanor sexual abuse of a child has a constitutional right to a jury trial because of the severe, "virtually inevitable," and "nearly . . . automatic" penalty of deportation that is triggered by a conviction for that offense, which constitutes an "aggravated felony" under the federal immigration laws.  For the reasons that follow, we hold that the answer to that question is "yes."

## I.   Factual and Procedural Background

In March 2012, appellant Jean-Baptiste Bado was charged by amended information with three counts of misdemeanor sexual abuse of a child, in violation of  D.C. Code § 22-3010.01 (2001).  The government alleged that on dates within the statutory limitations period (as well as on earlier dates as to which the government presented evidence of uncharged "other crimes"), appellant sexually abused his stepdaughter, J.D., by using his hand to touch her "vagina and/or vulva" (count 1), by using his hand to touch her breast (count 2), and by using his hand to touch her buttocks (count 3).  In an oral motion on April 25, 2012, supplemented by a written motion filed on May 17, 2012, appellant, who identified himself as a

political asylum applicant, demanded a jury trial.[1] He asserted that, together, the possible consequences of conviction of the charged offense — the statutory maximum period of incarceration (180 days), the assessment payable to the Victims of Violent Crime Compensation Fund, the requirement to register for ten years as a sex offender, and deportation pursuant to the federal immigration laws — are so severe that the offense must be recognized as a serious offense for which a jury trial must be afforded.

The motions judge, the Honorable Jennifer M. Anderson, rejected appellant's demand for a jury trial. She noted first that this court, in *Foote v. United States*, 670 A.2d 366 (D.C. 1996), and *Thomas v. United States*, 942 A.2d 1180 (D.C. 2008), rejected the contention that "collateral" consequences such as deportation and mandatory sex offender registration elevate a presumptively "petty" offense to a "serious" one for which a jury trial is constitutionally

---

[1] The record indicates that appellant arrived in the United States on February 8, 2005, having fled from Burkina Faso after being "systematically prosecuted and tortured" for his political and religious beliefs and for his "political alignments." In his jury-demand motion, he told the court that he was a "political asylum applicant . . . currently in removal proceedings[,]" "pending a hearing on the finality of his [asylum] application[.]" He explained that the immigration judge, having learned of the criminal charges against him, took his political asylum case off the calendar, on the rationale that misdemeanor child sexual abuse, an aggravated felony, is an offense for which appellant faced the possibility "of being barred from receiving political asylum, and [being] remov[ed] from the United States" if convicted.

mandated.[2]  Judge Anderson also reasoned that the Supreme Court's opinion in *Padilla v. Kentucky*, 559 U.S. 356 (2010), "has not changed the current status of law in the District of Columbia" with respect to a non-citizen's right to a jury trial.

The matter proceeded to a bench trial before the Honorable Stuart Nash. The government presented evidence, primarily through the testimony of J.D., that appellant sexually abused her on numerous occasions during the years preceding her sixteenth birthday.  J.D. testified that the abuse began shortly after appellant moved in with her family in early 2007.[3]

---

[2]  *See Foote*, 670 A.2d at 372 ("Foote's reliance on such uncertain and purely collateral consequences[, such as exclusion or deportation from the United States] of his conviction must fail."); *Thomas*, 942 A.2d at 1186 ("[M]isdemeanor child sexual abuse falls squarely within the crimes that we define as 'petty' because its maximum penalty is 180 days[.]").

[3]  Appellant testified that he had never touched J.D. inappropriately, and he specifically denied ever having touched her vaginal area or buttocks.  He further testified that J.D.'s animosity toward him arose from her resentment of his instructions that she must do household chores such as washing dishes and from an incident during which he claimed to have caught J.D. looking at pornographic pictures on the family computer and reported that to J.D.'s mother.

On July 27, 2012, after a two-day bench trial, Judge Nash found appellant guilty of one count of misdemeanor sexual abuse of a child.[4] Specifically, Judge Nash found appellant guilty of count 1, finding that during the limitations period, there was contact between appellant's hand and J.D.'s vaginal area while J.D. was clothed (thus crediting J.D.'s testimony that on July 28, 2011, the day before her sixteenth birthday, appellant touched her in the area over her vagina on top of her jeans).[5] Judge Nash sentenced appellant to 180 days' incarceration, the statutory maximum period of imprisonment, *see* D.C. Code § 22-3010.01 (a), and ordered him to pay $50 to the Victims of Violent Crime Compensation Fund. The court subsequently amended appellant's sentence to include a notification that appellant

---

[4] Judge Nash found J.D.'s testimony to be "entirely credible," but granted appellant's motion for judgment of acquittal as to count 2 because J.D. did not testify to an incident within the limitations period in which appellant touched her breast. Judge Nash also "decline[d] to find beyond a reasonable doubt" that the purpose of appellant's contact with J.D.'s buttocks was for sexual gratification and therefore acquitted appellant of count 3.

[5] *See* D.C. Code § 22-3010.01 (a) (establishing a penalty for an adult who engaged in "sexually suggestive conduct" with a minor) and D.C. Code § 22-3010.01 (b)(2) (providing that "sexually suggestive conduct" includes "[t]ouching a child or minor inside or outside his or her clothing close to the genitalia, anus, breast, or buttocks").

must register as a sex offender pursuant to the Sex Offender Registration Act of 1999 ("SORA"). *See* D.C. Code § 22-4002 (a) (2012 Repl.).[6]

On appeal from his conviction, appellant makes essentially the same argument he made in his motion demanding a jury trial: that although misdemeanor sexual abuse of a child is punishable by no more than 180 days' incarceration, he was entitled to a jury trial.[7] This is so, he argues, because of the inherent "serious" nature of the offense and the non-incarceration consequences that follow upon conviction, including required sex offender registration and

---

[6] According to appellant's brief, following completion of his 180-day prison sentence, he was moved to a federal detention facility in January 2013 to await removal proceedings. *See* 8 U.S.C. § 1226 (c)(1)(B) (2006) (mandating that the Attorney General of the United States take custody of any alien who has been convicted of any of a number of specified offenses and detain such alien pending his removal). At oral argument in this matter on May 28, 2014, however, appellant's counsel informed the court, without further explanation, that appellant had been released from detention "a few months" earlier. As far as the record discloses, however, appellant remains subject to removal from this country.

[7] If appellant is correct, he is entitled to reversal of his conviction without more because deprivation of the right to a jury trial constitutes structural error that requires reversal. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993); *Fortune v. United States*, 59 A.3d 949, 956 (D.C. 2013) (holding that the denial of a defendant's right to jury trial is structural error, i.e., an error "so intrinsically harmful as to require reversal without regard to [its] effect on the particular trial's outcome").

immigration consequences. As to the immigration consequences, appellant contends that *Padilla* requires that this court revisit its reasoning in *Foote*.[8]

## II.    Applicable Law

The Sixth Amendment to the United States Constitution provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI. "It has long been settled[,]" however, that "there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision." *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 541 (1989) (quoting *Duncan v.*

---

[8] In a footnote in his reply brief, appellant also asserts that he was entitled to a jury trial under the International Covenant on Civil and Political Rights ("ICCPR"). However, while the United States ratified the ICCPR in 1992, the ICCPR is not self-executing and has not been given effect by congressional legislation. *See Bannerman v. Snyder*, 325 F.3d 722, 724 (6th Cir. 2003) (stating that the ICCPR is not "judicially enforceable 'law' of the United States"); *United States v. Duarte-Acero*, 296 F.3d 1277, 1283 (11th Cir. 2002) ("Treaties affect United States law only if they are self-executing or otherwise given effect by congressional legislation."); *United States v. Duarte-Acero*, 208 F.3d 1282, 1284 n.8 (11th Cir. 2000) ("The Senate gave its consent to the ICCPR subject to the following declaration: 'That the United States declares that the provisions of Article 1 through 27 of the Covenant are not self-executing.'") (quoting 138 Cong. Rec. S4781, S4783 (daily ed. Apr. 2, 1992)); *Shibeshi v. United States*, 920 F. Supp. 2d 105, 107 (D.D.C. 2013) ("The ICCPR is not self-executing, and therefore is not privately enforceable[.]") (quoting *Elie v. Holder*, 443 F. App'x 635, 638 (2d Cir. 2011)).

*Louisiana*, 391 U.S. 145, 159 (1968) (distinguishing between "serious offenses" and "petty crimes" and holding that only the former trigger a right to a jury trial)) (internal quotation marks omitted).

*Baldwin v. New York*, 399 U.S. 66, 69 (1970), established that "no offense can be deemed 'petty' for purposes of the right to trial by jury where imprisonment for more than six months is authorized." *See also id.* at 69-70 (declining to "draw the line between 'petty' and 'serious' to coincide with the line between misdemeanor and felony" and recognizing that "some misdemeanors are also 'serious' offenses"). In *Blanton* and *United States v. Nachtigal*, 507 U.S. 1 (1993) (per curiam), the Supreme Court further addressed how courts are to draw the line between "petty crimes or offenses," as to which a jury trial is not required, and more serious crimes, for which a defendant is entitled to trial by jury. *Blanton*, 489 U.S. at 541. The Court instructed that offenses for which the maximum period of incarceration is six months or less are presumptively "petty." *Id.* at 543; *Nachtigal*, 507 U.S. at 3-4. This is a presumption that a defendant can overcome "only by showing that the additional penalties, viewed together with the maximum prison term, are so severe that the legislature clearly determined that the offense is a 'serious' one." *Nachtigal*, 507 U.S. at 3-4 (citing *Blanton*, 489 U.S. at 543 ("This standard, albeit somewhat imprecise, should ensure the availability of a jury

trial in the rare situation where a legislature packs an offense it deems 'serious' with onerous penalties that nonetheless 'do not puncture the 6-month incarceration line.'")).[9]

D.C. Code § 16-705 provides in pertinent part that:

> In any case where the defendant is not under the Constitution of the United States entitled to a trial by jury, the trial shall be by a single judge without a jury, except that if — (1) (A) The defendant is charged with an offense which is punishable by a fine or penalty of more than $1,000 or by imprisonment for more than 180 days (or for more than six months in the case of the offense of contempt of court); . . . and (2) The defendant demands a trial by jury, the trial shall be by jury, unless the defendant in open court expressly waives trial by jury and requests trial by the court, and the court and the prosecuting officer consent thereto.

D.C. Code § 16-705 (b)(1)-(2) (2012 Repl.).[10] As part of the Omnibus Public Safety Act of 2006, the Council of the District of Columbia (the "Council") created

---

[9] The Supreme Court has also made clear that "[t]he fact that [a defendant] was charged with two counts of a petty offense does not revise the legislative judgment as to the gravity of that particular offense, nor does it transform the petty offense into a serious one, to which the jury trial right would apply. . . . [T]here is precedent at common law that a jury trial was not provided to a defendant charged with multiple petty offenses." *Lewis v. United States*, 518 U.S. 322, 327 (1996).

[10] As we noted in *Fretes-Zarate v. United States*, with regard to its law governing the right to a jury trial, the District of Columbia differs from "the vast

(continued…)

a "new misdemeanor child sexual abuse provision." D.C. Council, Report on Bill 16-247, at 11 (Apr. 28, 2006). In legislating the provision entitled "[m]isdemeanor sexual abuse of a child or minor," the Council provided that "sexually suggestive conduct with [a] child or minor," an offense that comprises "touching a child or minor inside or outside his or her clothing close to the genitalia, anus, breast, or buttocks[,]" is punishable by "imprison[ment] for not more than 180 days," a fine, or both. D.C. Code § 22-3010.01 (a), (b)(2).[11]

In *Padilla v. Kentucky*, the Supreme Court described the dramatic changes that have occurred in the federal immigration laws over the last 90 years. 559 U.S.

---

(…continued)
majority of the fifty states in our union[,] who afford, either under their state constitutions or by statute, a right to a jury trial to anyone charged with a crime where there is a possibility of imprisonment for any period of time." 40 A.3d 374, 378 n.3 (D.C. 2012) (per curiam).

[11] This court has previously rejected the argument that, although the Council "effected a facial reduction in the maximum sentences for [various crimes, through misdemeanor streamlining legislation], the Council never intended to transform these crimes into 'petty' offenses" but instead made a "transparent attempt . . . to deny defendants the right to a jury trial by the wholesale rewriting of the misdemeanor code . . . ." *Burgess v. United States*, 681 A.2d 1090, 1094-95 (D.C. 1996) (internal quotation marks omitted); *see also Stevenson v. District of Columbia*, 562 A.2d 622, 623 n.1 (D.C. 1989) ("In light of this plain focus on statutory penalties, we decline appellant's invitation to search the committee report or other legislative history for additional indications that the Council believed driving under the influence to be a 'serious' offense.").

at 360-64.  The Court focused in particular on the changes effected in 1996 through the Anti-Terrorism and Effective Death Penalty Act (AEDPA)[12] and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).[13]  "In 1996," the Court emphasized, "Congress . . . eliminated the Attorney General's authority to grant discretionary relief from deportation[.]"  *Padilla*, 559 U.S. at 363.  Thus, the Court explained, "if a noncitizen has committed a removable offense after the 1996 effective date of these amendments,  his removal is practically inevitable but for the possible exercise of limited remnants of equitable discretion vested in the Attorney General to cancel removal[.]"  *Id.* at 363-64.

### III.    Analysis

### A.

We reject with only a brief discussion appellant's first argument, i.e., that the inherent nature of the crime of which he was convicted and the "inescapable societal disapproval" and "lasting social stigmas" attendant to conviction of sexual

---

[12]  Pub. L. No. 104-132, § 440, 110 Stat. 1214, 1277 (1996).

[13]  Pub. L. No. 104-208, § 304, 110 Stat. 3009-594 (1996).

abuse of a child[14] require that it be recognized as a "serious" offense, for which a jury trial is required, even though the maximum period of incarceration is 180 days. The Supreme Court instructed in *Blanton* that judicial attempts to distinguish between petty and serious offenses are to focus on "objective indications of the seriousness with which society regards the offense," the "most relevant" of which is "the severity of the maximum authorized penalty" of incarceration. *Blanton*, 489 U.S. at 541 (internal citations and quotation marks omitted); *see also id.* at 542 ("Primary emphasis . . . must be placed on the maximum authorized period of incarceration[, because while p]enalties such as probation or a fine may engender a significant infringement of personal freedom, . . . they cannot approximate in severity the loss of liberty that a prison term entails." (internal quotation marks and citation omitted)). This court recognized in *Burgess*, 681 A.2d at 1095, that "[w]hether a crime is 'serious' for Sixth Amendment purposes . . . is a question that can be answered only by the sort of analysis prescribed by the Supreme Court in *Blanton* and *Nachtigal*." We may not "substitute [our] judgment as to seriousness for that of a legislature, which is far better equipped to perform the task[.]" *Blanton*, 489 U.S. at 541 (internal quotation marks omitted).

---

[14] Appellant emphasizes Judge Nash's comment at sentencing that the 180-day period of incarceration the court imposed was "not . . . commensurate or consistent with the evil that [appellant] ha[d] perpetrated[.]"

**B.**

Appellant's next argument, too, is easily disposed of.  He contends that the requirement that a defendant register as a sex offender upon conviction of misdemeanor sexual abuse of a minor amounts to an additional statutory penalty that, in conjunction with the authorized 180-day period of incarceration, is so severe as to require that the defendant be afforded a jury trial.  This court has previously rejected the argument that the registration requirement amounts to an additional penalty that elevates misdemeanor child sexual abuse to a jury-demandable offense.  In *Thomas v. United States*, an appeal from a conviction of two counts of misdemeanor child sexual abuse, we concluded, applying the plain-error review standard, that the trial court "did not commit error -- let alone plain error -- when it held a bench trial instead of a jury trial[.]"  *Thomas*, 942 A.2d at 1186-87.  We reasoned that SORA is a non-punitive regulatory scheme designed to promote public safety, that SORA registration "is an administrative requirement and [is] not penal in nature," and that "the Sixth Amendment does not require that

we divert in this case from the statute that calls for jury trial in only th[o]se cases where the maximum penalty exceeds 180 days." *Id.* at 1186.[15]

## C.

Appellant's most substantial argument relates to the immigration consequences of his conviction. He relies on the principle, articulated in *Blanton* and *Nachtigal*, that a defendant who faces a maximum prison term of six months or less "is entitled to a jury trial . . . if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton*, 489 U.S. at 543; *Nachtigal*, 507 U.S. at 3-4. He emphasizes that under federal immigration law, it was clear at the time of his jury demand that conviction of misdemeanor sexual abuse of a child

---

[15] In light of our conclusion that the immigration penalties resulting from his conviction entitle appellant to a jury trial, we have no need to address appellant's argument that, together, the requirement of sex offender registration upon conviction and the immigration consequences of conviction, "when viewed in conjunction with the maximum authorized period of incarceration," entitled him to a jury trial. *Blanton*, 489 U.S. at 543.

would render him removable from the United States.[16]  *See* 8 U.S.C. § 1227 (a)(2)(A)(iii) (2006) (providing that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable"); 8 U.S.C. § 1101 (a)(43)(A) (defining "aggravated felony" to include "sexual abuse of a minor").  He argues that deportation is an additional statutory penalty for the offense, one that is of such severity that it clearly reflects a legislative determination that the offense is "serious."

As Judge Anderson recognized, this court repeatedly has rejected the argument that the immigration consequences of a criminal conviction elevate what would otherwise be a petty crime to a jury-demandable offense.  *See Foote*, 670 A.2d at 372; *Olafisoye v. United States*, 857 A.2d 1078, 1083-84 (D.C. 2004).

---

[16]  "The changes to our immigration law have also involved a change in nomenclature; the statutory text now uses the term 'removal' rather than 'deportation.'"  *Padilla*, 559 U.S. at 364 n.6.  "A 'removable' individual is one whom the immigration authorities may lawfully expel from the United States; both 'deportable' and 'inadmissible' individuals are 'removable.'"  *Coyomani-Cielo v. Holder*, 758 F.3d 908, 909 (7th Cir. 2014).  Generally, "[a] 'deportable' individual is a non-citizen who . . . was lawfully admitted into the United States, but who later became removable for any of a number of reasons" specified in the federal immigration statute, such as by committing a specified offense.  *Id.* at 909-10.  "An 'inadmissible' individual is a non-citizen who . . . was not formally admitted into the country, and who is removable for any of several reasons" specified in the immigration statute (for example, on the basis of having committed a crime listed in 8 U.S.C. § 1182 (a)(2)).  *Id.* at 910.

However, we agree with appellant that, in light of *Padilla*, those decisions do not dictate the same result here.

*Foote* — decided in January 1996, prior to the effective date of the 1996 amendment to the Immigration and Nationality Act (the "federal immigration statute")[17] — was an appeal from convictions of possession of cocaine and possession of drug paraphernalia ("PDP"). Foote argued that persons who unlawfully possess a controlled substance are subject to "residential eviction, forfeiture of assets, revocation of driving privileges, *exclusion or deportation from the United States*, ineligibility for federal benefits, and enhanced periods of incarceration for repeat offenders[,]" consequences that he argued were so severe that the offense cannot be "petty" for purposes of the Sixth Amendment right to a jury trial. 670 A.2d at 370 (emphasis added, footnotes omitted).[18] Assuming without deciding that Foote had sufficiently preserved the issue for review, we rejected his claim, reasoning that the consequences he described were "not included or even mentioned in the two statutes under which he was charged" and were "not punishment for violations of the drug possession or PDP statutes[.]" *Id.*

---

[17] 8 U.S.C. §§ 1101 *et seq.*

[18] However, nothing in the opinion in *Foote* indicates that Foote was anything other than a United States citizen.

at 372. Moreover, we reasoned, "the trial judge had no authority to impose the[se consequences] as part of Foote's sentence"; rather, the consequences "could be imposed only in hypothetical civil or administrative proceedings . . . which ha[d] not been instituted against Foote, and in most cases could not be brought against him." *Id.* We said that "[a]t least on these facts, . . . Foote's reliance on such uncertain and purely collateral consequences of his conviction must fail." *Id.* (footnotes omitted). We explicitly "confine[d] this conclusion to the present record," reasoning that "the future may bring scenarios which prudence counsels our not resolving anticipatorily." *Id.* at 372 n.19 (internal quotation marks omitted).

The legal backdrop and the constellation of facts in the instant case are quite different. It is true that the trial judge had no authority to impose immigration consequences on appellant,[19] but that fact is one of very few parallels with *Foote*. As appellant asserts and as we discuss below, after the analysis in *Padilla*, Supreme Court jurisprudence no longer permits the *Foote* court's characterization

---

[19] *See also Smith v. United States*, 768 A.2d 577, 580 (D.C. 2001) (rejecting the claim that a police officer charged with simple assault was entitled to a jury trial on the ground that a statute then in effect provided that police officers could be terminated for cause should they commit either a felony or a misdemeanor, and noting that "[s]uch adverse action for cause could be imposed only . . . in proceedings outside the province of the sentencing court").

of immigration consequences as "purely collateral." Further, for appellant, whose asylum application was put on hold because of his pending trial[20] and who was in post-conviction detention for many months after serving his sentence of imprisonment, the administrative and other immigration-related consequences have not been merely hypothetical. And, it can be argued, the 1996 changes in the federal immigration statute are the "future . . . scenario[]" that the *Foote* court acknowledged might call for a different conclusion. *Foote*, 670 A.2d at 372 n.19.

*Olafisoye* was an appeal by a non-citizen who had been convicted of misdemeanor sexual abuse (of an adult) and one count of marijuana possession. Olafisoye claimed that the additional penalties of SORA registration and possible deportation changed the nature of his offenses from "petty" to "serious" and required a jury trial. *Olafisoye*, 857 A.2d at 1081, 1083, 1083 n.4. We concluded (1) that Olafisoye's assertion about deportation as a consequence of conviction was "based on an incorrect reading" of the applicable statute,[21] and (2) that even on the

---

[20] See *supra* note 1.

[21] We explained, *inter alia*, that even on the assumption that misdemeanor sexual abuse (of an adult) is a crime of moral turpitude, Olafisoye would not be rendered deportable based on the crimes-of-moral-turpitude provision of the immigration statute, *see* 8 U.S.C. § 1227 (a)(2)(A)(i), because that provision renders a defendant deportable if he is convicted of a crime of moral turpitude for which a "sentence of one year or longer may be imposed," while the maximum

(continued…)

assumption that Olafisoye was subject to the penalties he identified, "the administrative or collateral consequences of conviction, unless they are considered an intrusive infringement on liberty, do not implicate one's constitutional right to a jury trial." *Id.* at 1083; *see also id.* at 1084 ("[E]ven if appellant could be deported for his conviction, administrative deportation proceedings do not raise an otherwise petty offense to the level requiring a jury trial.").

The instant case differs from *Olafisoye* in important respects. First, the law is clear, and the government has not disputed, that appellant's conviction of "misdemeanor sexual abuse of a child or minor," although a misdemeanor under District of Columbia law, constitutes an "aggravated felony" for purposes of the federal immigration laws. *See* 8 U.S.C. § 1101 (a)(43)(A).[22] The law is also clear that "[a]ny alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227 (a)(2)(A)(iii). Thus, unlike Olafisoye's

---

(…continued)
sentence of imprisonment for misdemeanor sexual abuse is only 180 days. *Olafisoye*, 857 A.2d at 1084 n.6.

[22] *See also United States v. Ramirez*, 731 F.3d 351, 354-56 (5th Cir. 2013) (holding that the offense of which Ramirez was convicted, third-degree sexual abuse of a minor, was an aggravated felony under the federal immigration statute even though it was punishable as a misdemeanor and carried a maximum sentence of three months' imprisonment in the state where he was convicted).

conviction, appellant's conviction rendered him deportable. Moreover, even though *Olafisoye* was decided after the 1996 changes to the federal immigration statute, it relied on *Foote*'s pre-amendment analysis that removal was too collateral and too hypothetical a consequence to factor into the jury-trial-right analysis. But, to repeat, the Supreme Court's opinion in *Padilla* undermines the characterization of immigration consequences as "collateral."[23]

The Supreme Court held in *Padilla* that "counsel must inform her client whether his plea carries a risk of deportation" and that "failure to do so clearly satisfies the first prong of the *Strickland* analysis,"[24] i.e., constitutes constitutionally deficient representation.[25] *Padilla*, 559 U.S. at 371, 374 (internal

---

[23] We noted the possible impact of *Padilla* in *Fretes-Zarate*, an appeal from a conviction for simple assault that "subject[ed Fretes-Zarate] to deportation under federal immigration law," but we decided the case under the strictures of plain-error review (because "defense counsel did not request a jury trial at any point in the proceedings"). *Fretes-Zarate*, 40 A.3d at 374, 376. We concluded that "in accordance with the extremely limited plain-error standard . . . it was not plain, clear or obvious error in this case for appellant to be denied a jury trial." *Id.* at 378-79 (internal quotation marks omitted).

[24] *See Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984).

[25] Padilla, a native of Honduras who was a lawful permanent resident of the United States, pled guilty to transporting a large amount of marijuana. *Padilla*, 559 U.S. at 359. It appears that his offense, "trafficking in more than five pounds of marijuana," for which he was sentenced to ten years' incarceration, *Padilla v. Commonwealth*, 381 S.W.3d 322, 324 (Ky. Ct. App. 2012), constituted "illicit
(continued…)

quotation marks omitted). The Court "agree[d] with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation." *Id.* at 360. In explaining its rationale, the Court recognized that, while prior to 1996 there "was no such creature as an automatically deportable offense[,]" *id.* at 362, changes in the immigration law eliminated the authority of courts and of the Attorney General to "alleviate the harsh consequences of deportation." *Id.* at 360, 363. One result is that the "drastic measure of deportation or removal . . . is now virtually inevitable for a vast number of noncitizens convicted of crimes." *Id.* at 360 (internal quotation marks and citation omitted); *see also id.* at 366 ("[I]mportantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders."). Another result is that "as a matter of federal law, deportation is an integral part — indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Id.* at 364 (footnote omitted).

The Court referred to the "unique nature of deportation[,]" stating that it has "long recognized that deportation is a particularly severe 'penalty,'" though "not,

---

(…continued)

trafficking in a controlled substance," which is an aggravated felony under federal immigration law. *See id.* at 328; 8 U.S.C. § 1101 (a)(43)(B).

in a strict sense, a criminal sanction."[26] *Id.* at 365. It recognized that "[p]reserving [a defendant's] right to remain in the United States may be more important to the [defendant] than any potential jail sentence." *Id.* at 368 (quoting *INS v. St. Cyr*, 533 U.S. 289, 322 (2001)). The Court also observed that deportation is "intimately related to the criminal process[,]" and that, "in the deportation context[,]" it is "most difficult to divorce the penalty from the conviction[.]" *Id.* at 365-66 (internal quotation marks omitted). It declared that "[d]eportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence." *Id.* at 366.[27]

---

[26] *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 526 (2009) ("This Court has long understood that an 'order of deportation is not a punishment for crime.'" (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 730 (1893)); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) ("The purpose of deportation is not to punish past transgressions[.]"); *Mahler v. Eby*, 264 U.S. 32, 39 (1924) ("It is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment.").

[27] *See also Chaidez v. United States*, 133 S. Ct. 1103, 1110 (2013) ("Deportation, we stated [in *Padilla*], is 'unique.' It is a 'particularly severe' penalty, and one 'intimately related to the criminal process'; indeed, immigration statutes make it 'nearly an automatic result' of some convictions. We thus resolved the threshold question before us by breaching the previously chink-free wall between direct and collateral consequences[.]" (internal citations omitted)); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) ("That deportation is a penalty . . . cannot be doubted.").

The *Padilla* Court's statements provided context for its holding on the scope of the Sixth Amendment right to effective assistance of counsel and were not addressed to the Sixth Amendment jury-trial guarantee. Nevertheless, we cannot ignore the Court's observation that, in light of current federal immigration law, the immigration consequences of a defendant's conviction cannot be considered merely "collateral." Also, because the Court recognized that "criminal convictions and the penalty of deportation" are "enmeshed[,]" *Padilla* cautions us against reliance on whether the trial judge has authority to impose that additional penalty as a factor determinative of whether a defendant facing potential deportation has a right to a jury trial. *Id.* at 365-66. Thus, to the extent that our holdings in *Foote* and *Olafisoye* were premised on contrary reasoning, they no longer provide sufficient or reliable guidance, at least with respect to criminal offenses that make deportation "virtually inevitable" or "nearly an automatic result" for the non-citizen defendant. *Padilla*, 559 U.S. at 360, 366.[28]

That, however, is the beginning rather than the end of our analysis. For a non-citizen convicted of a deportable offense, deportation or removal is a statutory

---

[28] Because we are satisfied that the rationale of those decisions "has been substantially undermined by [the] subsequent Supreme Court decision[]" in *Padilla*, we are not "oblige[d] to follow, inflexibly" their holdings. *Lee v. United States*, 668 A.2d 822, 828 (D.C. 1995).

penalty (that is in addition to any authorized period of incarceration); thus, to determine whether exposure to such an additional penalty gives a defendant a constitutional right to a jury trial, we must ask whether, "viewed in conjunction with the maximum authorized period of incarceration, [the additional statutory penalties are] so severe that they *clearly* reflect a legislative determination that the offense in question is a 'serious' one." *Blanton*, 489 U.S. at 543 (emphasis added); *Nachtigal*, 507 U.S. at 3-4.

Conviction of any of a large number of criminal offenses renders a non-citizen "deportable" under the immigration statute. *See* 8 U.S.C. § 1227 (a)(2). There can be no doubt that actual deportation is a "particularly severe penalty." *Padilla*, 559 U.S. at 365.[29] Persons who are deportable may not in fact be deported, however, because the immigration statute also creates some avenues of relief to avoid actual removal. Appellant has no recourse to relief because the offense of misdemeanor sexual abuse of a child is an aggravated felony under

---

[29] Deportation "may . . . visit as great a hardship as the deprivation of the right to pursue a vocation or a calling" and "may result in the loss of all that makes life worth living." *Bridges*, 326 U.S. at 147 (internal quotation marks omitted). It is "at times the equivalent of banishment or exile," *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948), and avoidance of it "may be more important to the [defendant] than any potential jail sentence." *St. Cyr*, 533 U.S. at 322 (quoting 3 Matthew Bender, *Criminal Defense Techniques* §§ 60A.01, 60A.02[2] (1999)).

federal immigration law, and conviction of such an offense rendered appellant ineligible for cancellation of removal. *See* 8 U.S.C. § 1229b (a)(3) ("The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable from the United States *if the alien . . . has not been convicted of any aggravated felony*" (emphasis added)); 8 C.F.R. § 1240.66 (c)(1) (providing that a non-citizen is ineligible for special rule cancellation if he or she has an aggravated felony conviction); *Lopez v. Gonzales*, 549 U.S. 47, 50 (2006) ("[T]he Attorney General's discretion to cancel the removal of a person otherwise deportable does not reach a convict of an aggravated felony.").[30]

---

[30]  *See also United States v. Couto*, 311 F.3d 179, 183-84 (2d Cir. 2002) ("[T]he Immigration and Nationality Act eliminated all discretion as to deportation of non-citizens convicted of aggravated felonies[.]"); *Ellis v. United States*, 806 F. Supp. 2d 538, 551 (E.D.N.Y. 2011) ("[B]y the time petitioner entered his guilty plea [in 1997], a noncitizen convicted of an 'aggravated felony,' . . . was subject to automatic deportation."); *id.* at 546 (recounting that "[i]n *Padilla*, Jose Padilla, a lawful permanent resident of the United States, pleaded guilty to transporting marijuana and, as a result, faced automatic deportation to his native Honduras"); Susan Pilcher, *Justice Without a Blindfold: Criminal Proceedings and the Alien Defendant*, 50 Ark. L. Rev. 269, 329 (1997) ("[A]voidance of an aggravated felony charge will often be of paramount concern, even at the cost of pleading guilty to an arguably more serious crime of moral turpitude, insofar as options for relief from deportation or waivers of future inadmissibility may remain available for the latter.").

We note that there are some more limited avenues of relief for a non-citizen who has been convicted of an aggravated felony. Such a non-citizen may be eligible for withholding or deferral of removal in accordance with this nation's obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). *See* 8 U.S.C. § 1231 (b)(3)(A) (2006)

(continued…)

In addition, as a non-citizen convicted of an aggravated felony, appellant is ineligible for the asylum that he was actively seeking before an immigration judge at the time he went to trial in the instant matter. 8 U.S.C. § 1158 (b)(2)(A)(ii) provides that a non-citizen is ineligible for asylum if the Attorney General determines that the non-citizen, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158 (b)(2)(B)(i) (2006) then provides that "an alien who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime" for the purpose of 8 U.S.C. § 1158 (b)(2)(A)(ii). *See Santos-Infante v. Att'y Gen. of the United States*, 574 F. App'x 142, 145 n.2 (3d Cir. 2014) ("An alien convicted of an aggravated felony is considered to have

---

(…continued)

(providing that the Attorney General "may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion"); 8 C.F.R. § 1208.16 (c)(2) (2014) (providing for withholding of removal if the non-citizen establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal"); 8 C.F.R. § 1208.17 (a) (2014) (providing for deferral of removal to the country where a non-citizen "is more likely than not to be tortured"). But these types of relief do not preclude the non-citizen from being deported to another country. *See* 8 C.F.R. § 1208.16 (f) ("Nothing in [§ 1208.16 or in 8 C.F.R.] § 1208.17 shall prevent the Service from removing an alien to a third country other than the country to which removal has been withheld or deferred.").

been convicted of a particularly serious crime for purposes of the asylum statute. . . . Such an alien is ineligible for asylum.").

In light of these bars to relief from immigration-law penalties for non-citizens who have been convicted of aggravated felonies, we are satisfied that the crimes Congress has designated as falling within this category are offenses for which Congress has mandated statutory penalties that *clearly* reflect a legislative determination that the offenses are serious ones.

Although, in determining whether a defendant is entitled to a jury trial, we ordinarily look to what our own legislature has done, we are mindful that the Supreme Court has "frequently looked to the federal classification scheme in determining when a jury trial must be provided." *Blanton*, 489 U.S. at 545 n.11. We think that is appropriate here since only Congress may establish the penalty of deportation[31] (deportable status is not a penalty the Council, or a state legislature,

---

[31] Congress's "plenary power over immigration matters," *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 201 (1993), gives it the unique and exclusive ability to "pack[] an offense it deems serious with onerous penalties that nonetheless do not [cause the maximum period of incarceration] to puncture the 6-month . . . line." *Nachtigal*, 507 U.S. at 5 (internal quotation marks omitted). We understand the government's argument that, for purposes of determining whether an offense that is presumptively petty must be deemed serious for purposes of the Sixth Amendment right to a jury trial, we must look only to the penalties imposed by the

(continued…)

could authorize even if it were of the view that deportation is an appropriate penalty for certain crimes); since any deportation penalty Congress establishes affects non-citizens convicted of the relevant offenses in every United States jurisdiction; and since, like incarceration (which is "an 'intrinsically different' form of punishment" and "the most powerful indication of whether an offense is serious"[32]), deportation is a "unique" penalty, *Padilla*, 559 U.S. at 365, avoidance of which may be more important to the defendant "than any potential jail sentence." *Id.* at 368 (internal quotation marks omitted).

We therefore hold that a non-citizen charged with an aggravated felony is charged with a crime that must be deemed a serious rather than petty crime for

---

(…continued)
Council of the District of Columbia. However, we discern no compelling reason to accept that argument. Our dissenting colleague calls for a more rigorous examination than this majority opinion offers of "whether the immigration consequences of a criminal conviction qualify as 'additional statutory penalties' that transform a petty offense into a serious one." But aside from pointing out that the deportation, though a statutory penalty, is not punishment — a point we have already acknowledged *supra* at note 26 — he has not suggested what that more rigorous analysis would entail.

[32] *Blanton*, 489 U.S. at 542 (quoting *Muniz v. Hoffman*, 422 U.S. 454, 477 (1975)).

purposes of the Sixth Amendment.[33]   Accordingly, we hold that appellant was constitutionally entitled to a jury trial.   Because his demand for a jury trial was erroneously rejected by the trial court, and he was convicted after a bench trial, he is entitled to a reversal of his conviction.

*So ordered.*

---

[33]   We need not decide in this case whether any crimes listed in 8 U.S.C. § 1227 (a)(2) that have not been designated as aggravated felonies should be deemed serious for purposes of the Sixth Amendment jury trial right.

It is worth noting that many (if not most) of the offenses designated as "aggravated felonies" under the federal immigration statute have statutory maximum periods of imprisonment under District of Columbia law that are in excess of 180 days, meaning that a defendant facing trial for them in the District of Columbia is already statutorily entitled to a jury trial.  *See, e.g.*, 8 U.S.C. § 1101 (a)(43)(F) (treating a "crime of violence . . . for which the term of imprisonment [is] at least one year" as an aggravated felony); 8 U.S.C. § 1101 (a)(43)(G) (treating "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] at least one year" as an aggravated felony); *see also Lopez*, 549 U.S. at 55-60 (holding that for a drug crime to be an aggravated felony, it must be an offense for which the maximum term of imprisonment authorized for the offense under federal law is more than one year).

THOMPSON, *Associate Judge*, concurring:  I write separately to address a few matters that may need clarification and to respond to points raised in my colleagues' separate opinions.

To be clear, the focus of the majority opinion is not on the likelihood that deportation will actually occur for a non-citizen whose conviction has rendered him "deportable."  Rather, the majority opinion focuses on the facts that Congress at once (1) has declared certain crimes to be deportable offenses and (2) has nevertheless created avenues of relief from deportation that are available to many non-citizens, but (3) has made those avenues of relief categorically unavailable to non-citizens convicted of aggravated-felony offenses.  The opinion looks to the availability of statutory relief from deportation (*vel non*) not as it bears on the likelihood that conviction of an offense will lead to deportation, but as it bears on whether Congress has signaled that it clearly views the offense as serious.  This approach is anchored in the Supreme Court's instruction that courts are to look to whether additional statutory penalties, viewed together with the maximum period of incarceration, indicate "that the legislature clearly determined that the offense is a 'serious' one." *United States v. Nachtigal*, 507 U.S. 1, 3-4 (1993) (per curiam).[1]

---

[1]  Moreover, the possible availability of cancellation of removal bears on whether the "deportable" status that is triggered by conviction is "so severe." *Id.*

With reference to incarceration, which the Court has said must be the "primary emphasis,"[2] it makes sense to look to the "maximum penalty set by the legislature" as the best indicator of the seriousness with which the legislature regards the offense, because authorized periods of incarceration vary greatly, from minimum jail time to life in prison. But deportation does not come in degrees, and Congress has broadly declared as "deportable" offenses everything from possession of any more than 30 grams of marijuana to mass murder. For that reason, it is eminently reasonable, when looking to potential immigration consequences as a measure of the seriousness of an offense in Congress's estimation, to look to whether Congress has at the same time provided avenues for (at least some) individuals convicted of a deportable offense to have the penalty of removal canceled (and, conversely, whether, for those convicted of some deportable offenses, Congress has statutorily shut down all avenues of relief from removal). These seem to be the gradations of seriousness that exist in the immigration statute.

---

[2] *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 542 (1989).

In my view, Congress's declaration that conviction of any of a long list of enumerated but quite different types of offenses renders a non-citizen "deportable" is scant if any evidence that Congress views the offenses as serious in the Sixth Amendment sense. As other courts have recognized, in general, the immigration-law treatment of a non-citizen convicted of a "deportable" crime frequently turns not on the seriousness of the crime committed but on the status of the non-citizen in other respects. For example, in *Reyes v. Holder*, 714 F.3d 731 (2d Cir. 2013), the Second Circuit focused on the fact that an unadmitted alien convicted of a deportable "crime of moral turpitude" can qualify for a so-called "petty offense exception" to removal, while "[a] conviction involving [the same] petty offense . . . may still render an admitted alien *deportable*[.]" *Id.* at 735.[3] The Second Circuit explained that "[a]lthough it may seem anomalous that a legally admitted alien can be rendered ineligible for special rule cancellation of removal while an unadmitted alien who committed *the same crime* can remain eligible, we have previously noted that Congress's harsher treatment of legal permanent residents ('LPRs') may be justified on the basis that 'an LPR's violation of American laws represents a

---

[3] "Under the petty offense exception, a conviction for an offense involving moral turpitude does not render an unadmitted alien *inadmissible* . . . when (1) the maximum penalty possible was a year or less, and (2) the alien was actually sentenced to less than six months in prison." *Id.* This statutory exception seems to be a signal from Congress that some offenses that expose non-citizens to the threat of deportation are not so serious after all.

greater betrayal or poses a heightened concern of recidivism, and therefore calls for harsher measures under the immigration laws.'" *Reyes v. Holder*, 714 F.3d at 737 (quoting *Jankowski-Burczyk v. INS*, 291 F.3d 172, 179 (2d Cir. 2002)) (citing *Gonzalez-Gonzalez v. Ashcroft*, 390 F.3d 649, 652 (9th Cir. 2004) ("LPRs enjoy substantial rights and privileges not shared by other aliens, and therefore it is arguably proper to hold them to a higher standard and level of responsibility than non LPRs."))[4]  It might be said in short that immigration-law consequences of criminal conduct have less to do with the seriousness of offenses and more to do with a variety of other congressional policies and objectives with respect to the offenders.

In light of the foregoing, my view is that the provisions of the federal immigration statute that render a convicted non-citizen "deportable" do not "furnish[] us with [an] objective criterion by which a line could . . . be drawn . . . between offenses that [Congress does or does not] regard[] as 'serious[.]'"

---

[4] The *Reyes* court also described Congress's action in amending the immigration statute in an attempt to "prevent the mass deportation of aliens who had arrived from some former Soviet bloc and Central American nations," by allowing them, including individuals with certain criminal convictions, to apply for "'special rule' protection from deportation." *Reyes*, 714 F.3d at 733 (quoting *Tanov v. INS*, 443 F.3d 195, 199 (2d Cir. 2006)); *see* 8 C.F.R. § 1240.66 (c) (2014).

*Baldwin v. New York*, 399 U.S. 66, 72-73 (1970). That is, the fact that a non-citizen, upon conviction of a particular offense, is rendered "deportable" pursuant to one provision of the immigration statute, cannot be taken as a clear measure of the seriousness of the offense where, under another provision of the same statute, Congress has created a path to avoid deportation for certain categories of non-citizens convicted of the same offense. By contrast, Congress's harsh treatment of non-citizens convicted of aggravated felonies, admitting of no exceptions, leaves no room for doubt that Congress views these as serious offenses, no matter the status of the offender.

Judge Fisher predicts in his dissenting opinion that after the majority opinion, "issues of immigration law will become the central focus of criminal litigation whenever a noncitizen has been charged with an offense that ordinarily does not require a trial by jury." I do not think that will be the result of the holding that a non-citizen charged with an aggravated felony is entitled to a jury trial. As commentators have observed, because the immigration-law consequences of an aggravated felony conviction are so severe, avoiding having a charged offense treated as an aggravated felony will be a paramount objective of any non-citizen defendant. For that reason, unless it is clear and unambiguous that a charged offense qualifies as an aggravated felony under the federal immigration statute, I

expect that few defendants will be likely to advance that claim solely as a basis for obtaining an otherwise unavailable jury trial. Nor, contrary to Judge Ruiz's suggestion in her concurrence, will our holding today necessitate trial judges' "delving into the intricacies of whether a particular defendant is eligible or ineligible for relief." The relevant inquiry will be whether the charged offense is an aggravated felony under the federal immigration statute.

RUIZ, *Senior Judge*, concurring: I agree with Judge Thompson that the deportation consequence that flows from a conviction of misdemeanor child sexual abuse, when considered with the exposure to 180 days of incarceration, makes it a "serious" offense under the Sixth Amendment that entitled appellant to a jury trial. I take no issue with Judge Thompson's discussion that, because child sexual abuse is an "aggravated felony" under federal immigration law, appellant does not have recourse to relief from deportation or even an otherwise valid claim of asylum, which makes his situation particularly dire. That further explanation is not, however, necessary to the Supreme Court's analysis under the Sixth Amendment which looks to the "severity of the *maximum authorized* penalty" in assessing whether an offense is serious and warrants the right to a jury trial. *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 541 (1989) (quoting *Baldwin v. New York*, 399 U.S. 66, 68, (1970) (plurality opinion)) (emphasis added). The reason for this is clear:

"In fixing the maximum penalty for a crime, a legislature 'includes within the definition of the crime itself a judgment about the seriousness of the offense.'" *Id.* (quoting *Frank v. United States*, 395 U.S. 147, 149 (1969)). As the Court explained in *Blanton*, "[t]he judiciary should not substitute its judgment as to seriousness for that of a legislature, which is 'far better equipped to perform the task, and is likewise more responsive to changes in attitude and more amenable to the recognition and corrections of their misperceptions in this respect.'" *Id.* at 541-42 (quoting *Landry v. Hoepfner*, 840 F.2d 1201, 1209 (5th Cir. 1998) (en banc)). "The best indicator of society's views is the maximum penalty set by the legislature." *United States v. Nachtigal*, 507 U.S. 1, 3 (1993) (citation omitted). [1]

Applying this principle of deference to the legislative judgment, when the penalty is incarceration, what is relevant is the "maximum authorized period of incarceration." *Blanton*, 489 U.S. at 542. If the maximum authorized penalty punctures the six-month mark the offense is deemed "serious" for jury trial

---

[1] To be clear, I do not fault Judge Thompson's opinion for "second-guessing" the legislature as her analysis is based on statutory provisions of federal immigration law, but for going beyond what the Court requires. Once the legislature has made clear that deportation is a potential consequence, that ends the court's inquiry into what is the "maximum" penalty that may be imposed. The further provisions of immigration law on which Judge Thompson relies go to whether a defendant may have some recourse for relief from deportation or whether any relief is foreclosed by statute.

purposes; if not, the offense (in the absence of other penalties) is "presumptively 'petty.'" *Nachtigal*, 507 U.S at 3-4. Once the legislature has expressed its determination of seriousness by establishing the maximum penalty, it matters not that an implementing government official has discretion to further fix the maximum (or minimum) penalty so long as it is within the statutory mandate. *See id*. at 4. For that reason, it is irrelevant to the Sixth Amendment inquiry that a sentencing judge has discretion to impose a sentence shorter than the authorized maximum sentence (or the alternative of no sentence at all in favor of probation) if the authorized maximum sentence punctures the six-month mark. Applying analogous principles here, once the legislature has spoken by authorizing deportation, the Sixth Amendment inquiry should not turn on whether implementing officials have discretion to grant relief to certain limited classes of individuals or are precluded from doing so. To inquire into the possible availability of relief from deportation, rather than on deportation as the maximum penalty authorized by the legislature, upsets the rule established by the Supreme Court. If this approach were adopted and applied to incarceration it would be the equivalent of requiring that a greater-than-six-month penalty not be the maximum exposure (as *Blanton* mandates) but a mandatory minimum. That simply is not how the Court has analyzed whether the authorized penalty renders an offense "serious" under the Sixth Amendment.

I see no reason to depart from the rule established in *Blanton* and *Nachtigal* of considering the maximum authorized penalty when it comes to deportation and perceive sound practical reasons to adhere to it.[2]  *Blanton* instructs that when the maximum exposure to incarceration alone does not render an offense "serious," we must ask whether, "viewed in conjunction with the maximum authorized period of incarceration, [the additional statutory penalties] are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton*, 489 U.S. at 543; *see Nachtigal*, 507 U.S. at 3-4.  Judge Thompson contends that *Blanton*'s use of the phrase "clearly reflect" requires looking for further evidence of legislative determination of seriousness beyond exposure to deportation.[3]  But why should this be necessary?  The Court has already stated in no uncertain terms that deportation is "a particularly severe penalty," one that "may be more important to the [defendant] than any potential jail sentence." *Padilla v. Kentucky*, 559 U.S. 356, 365, 368 (2010) (citations and internal quotation marks omitted).  This "drastic measure," *id*. at 360 (citation omitted), is akin to "banishment or exile"  and not only removes the offender from the country

---

[2]  "Whether a crime is 'serious' for Sixth Amendment purposes . . . is a question that can be answered only by the sort of analysis prescribed by the Supreme Court in *Blanton* and *Nachtigal*." *Burgess v. United States*, 681 A.2d 1090, 1095 (D.C. 1996).

[3]  This further analysis is not anchored in any case from the Supreme Court or federal appellate court; the government has not presented it.

and tears him from his family, but in effect also hurts citizens and lawful residents of the United States who depend on the deported family member for emotional, physical and financial support. *See id*. at 373-74 (citation omitted). In light of these well-understood and long-recognized hardships of deportation, there is scarcely need to go sleuthing for clues beyond Congress's imposition of deportation as a consequence of a conviction to ascertain its determination that an offense meriting such a consequence is indeed serious.

Moreover, recall that in assessing the seriousness of an offense under the Sixth Amendment, the additional penalty of deportation is not considered in isolation but is to be "viewed in conjunction with the maximum authorized period of incarceration," *Blanton*, 489 U.S. at 543, which, in the case of misdemeanor sexual abuse of a child, is 180 days. D.C. Code § 22-3010.01 (a) (2012 Repl.). Considering that the Sixth Amendment would guarantee a jury trial if the maximum authorized incarceration were six months and one day, it would blink reality to conclude that, viewed together, the exposure to 180 days of incarceration *and* deportation are somehow insufficient to deem the offense serious so as to entitle appellant to a jury trial.

There is also a practical reason not to look beyond the maximum exposure to deportation in determining whether this additional penalty crosses the threshold of combined penalties that entitle the defendant to a jury trial. The decision whether to have a jury trial obviously must be made at the outset of the proceeding and a Superior Court judge must rule on the request for the proceeding to continue. There is a premium on clarity and promptness. Trial court judges and criminal lawyers are not uniformly steeped in the complexities of immigration law. The most forthright way for trial court judges to make a determination is to look at the maximum exposure (whether conviction renders the defendant deportable) by looking at the language of the immigration statute — as they now do with respect to the maximum exposure to incarceration — without further delving into the intricacies of whether a particular defendant is eligible or ineligible for relief. Therefore, from a practical standpoint, even if it were consistent with *Blanton* and *Nachtigal* — which it is not — adding a further step that requires analysis of immigration law is unwise.[4]

---

[4] That is not to say that situations will never arise where even the threshold question whether conviction will render the defendant deportable is in genuine doubt. *See Flores v. Ashcroft*, 350 F.3d 666, 668 (7th Cir. 2003) (noting that "classification of a state crime under a federal definition can be tricky"). The further question whether a conviction will be considered an aggravated felony can be even more complicated. *See*, *e.g.*, *Moncrieffe v. Holder*, 133 S. Ct. 1678, 1693 (2013) (noting that the Court has three times in seven years had to address whether low-level drug crime, a deportable offense, is an aggravated felony that strips

(continued…)

The dissent makes several points with which I disagree. Without elaboration, it declares as "startling" that a noncitizen would have a right to a jury trial but that a citizen charged with the same offense would not. I fail to see a legal basis for any perplexity on this point. Equal protection? It is a bedrock principle of equal protection analysis that the government may not discriminate against

---

(…continued)
defendant of all right to relief from deportation)*; see also Luna v. Holder*, 764 F.3d 152 (2d Cir. 2014), *cert. granted sub nom. Torres v. Lynch*, 2015 U.S. LEXIS 4400 (U.S. June 29, 2015) (No. 14-1096) (question presented is whether a state offense constitutes an aggravated felony under federal law on the grounds that the state offense is "described in" a specific federal statute if the federal statute includes an element of the offense — use in interstate or foreign commerce — that the state offense lacks).

These difficult questions will need to be addressed with expert assistance. But where the government has successfully opposed a demand for jury trial on the ground that conviction of an offense does not make the defendant deportable, principles of estoppel would prevent the government from changing the position taken pretrial by then, post-conviction, seeking to deport the defendant. *See Ward v. Wells Fargo Bank, N.A.*, 89 A.3d 115, 128 (D.C. 2014) (noting that judicial estoppel is designed to prevent a litigant from "changing his position according to the vicissitudes of self-interest"); *United States v. Barahona*, No. 14-DVM-1945, 2014 D.C. Super. LEXIS 19, at *9 n.5 (D.C. Super. Ct. Dec. 12, 2014) (noting that when the government urged the trial court to conclude that the defendants could not be deported following a conviction, the government would then be precluded by the doctrine of judicial estoppel "from taking a contrary position in hypothetical future immigration hearings involving the [d]efendants"). Estoppel may not cure or render harmless the deprivation of the jury trial right, but at a minimum it would serve a prudential purpose by encouraging the government to avail itself of expert government resources on immigration law and presenting them to the court and the defense before opposing a motion for jury trial.

persons who are "similarly situated." *Yick Wo v. Hopkins*, 118 U.S. 356, 368, 373-74 (1886); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) (noting that "equal protection of the laws" is a more specific safeguard encompassed within the Fifth Amendment's due process clause); *Smith v. United States*, 460 A.2d 576, 578 (D.C. 1983) (applying equal protection analysis to claim brought in the District of Columbia under the Fifth Amendment). A citizen and a noncitizen, even if charged with the same offense, are not "similarly situated" if only one faces the severe penalty of deportation. The analysis that *Blanton* and *Nachtigal* mandate, by focusing on the severity of the penalties that attend conviction, necessitates that the disparate penalty faced by the noncitizen be taken into account.[5] Since a citizen does not face — and could not face — the same penalty of deportation that a legislature may impose on a noncitizen, the interests at stake for the noncitizen clearly outweigh those of a citizen, further eroding any claim to equal protection. The stakes simply are not as high for the citizen.[6]

---

[5] Not every disparate treatment of similarly situated persons violates the equal protection guarantee; the difference in treatment must be unreasonable if not "irrational." *See Hurtado v. United States*, 410 U.S. 578, 590 (1973); *Bolling*, 347 U.S. at 499; *Yick Wo*, 118 U.S. at 373-74. Granting a jury trial based on the severity of the authorized penalty, as *Blanton* and *Nachtigal* mandate, is eminently reasonable.

[6] Congress has no authority to impose the penalty of deportation on a citizen. *See Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) (noting that "[t]he exclusion of aliens and the reservation of the power to deport have no permissible

(continued…)

The dissent also argues that deportation is not "punishment" for the offense but "rather, a consequence of abusing the privilege of living in this country." It is precisely because noncitizens treasure the privilege of living in this country — not the least because the Constitution applies to and its protections cover all "persons" within the territory of the United States, including aliens, *see Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (citing *Yick Wo*, 118 U.S. at 369), that deportation "may result in the loss of all that makes life worth living." *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (citation and internal quotation marks omitted). Whether deportation is considered a "punishment" of the type traditionally imposed for a criminal offense, that label is irrelevant to our substantive analysis. *Blanton* and *Nachtigal* speak of additional "penalties" — not "punishment" — that by definition are not the traditional penalty of incarceration. "[A]s a matter of federal

---

(…continued)

counterpart in the Federal Government's power to regulate the conduct of its own citizenry" and "would be unacceptable if applied to citizens"). Thus, in imposing the deportation penalty, Congress is aware that noncitizens are penalized more harshly than noncitizens for committing the same offense.

As Judge Fisher's dissent recognizes, a distinction in the penalty imposed on different categories of defendants is a valid basis for analysis under the Sixth Amendment in the case of recidivists and non-recidivists because it is "in essence, a different offense with a different maximum sentence." Similarly, federal immigration law essentially creates a substantially different offense for Sixth Amendment purposes applicable only to noncitizens going so far, in this case, as to actually label the offense an "aggravated felony" when it is committed by a noncitizen.

law, deportation is an integral part — indeed, sometimes the most important part — of the penalty that may be imposed on noncitizen defendants . . . ." *Padilla*, 559 U.S. at 364 (footnote omitted).

Finally, the dissent argues that exposure to deportation should not be taken into account in deciding whether the underlying offense is serious because deportation is not a penalty imposed by the Council of the District of Columbia but by the Congress of the United States. But as Judge Thompson's opinion explains, deportation is a penalty that only Congress may impose and the relevant provisions of federal immigration law apply to all state and local convictions encompassed by the federal definition of deportable offenses. *See* 8 U.S.C. § 1227 (a)(2) (2012). The District of Columbia has no authority to impose that penalty or to mitigate it. It is thus necessary to consider it as part and parcel of the penalties that attend a charge under District of Columbia law that is uniquely faced by noncitizens. *Brown v. United States*, 675 A.2d 953 (D.C. 1996), on which the dissent relies, is easily distinguishable. In *Brown* we rejected the argument that we should consider the one year incarceration penalty under federal law for possession of cocaine in determining whether the same possession, punishable under District of Columbia law by up to 180 days of incarceration, was "serious." *Id.* at 955. In *Brown*, as distinct from this case, the defendant was exposed only to the 180-day penalty of

incarceration imposed by D.C. law, and was not at any risk of exposure to the one-year penalty to which he would have been exposed had he been charged with the federal offense. *Id.* at 954. On the other hand, all convicted persons made deportable by federal immigration law are exposed to that penalty regardless of the source of the law under which the charge is made or where it is prosecuted. *Cf. id.* (noting that recidivist penalties did not entitle defendant to a jury trial because "[t]he government, however, never exposed Brown to the possibility of an enhanced sentence . . . by filing with the court a notice of prior convictions and prosecuting him as a repeat offender"). Similarly, *Brown*'s rejection of the argument that a jury trial was required by the revocation of probation and imposition of an additional 120 days in prison allegedly "triggered" by conviction of a second offense, punishable by a maximum of six months, that by itself did not entitle the defendant to a jury trial, *id.* at 955, is not applicable here. The probation revocation in *Brown* was not a penalty provided by the legislature for conviction of the second offense but was "a continuation of the prosecution of his first offense" by the sentencing judge in the first case in the exercise of discretion following violation of the terms of probation that had been set by that judge. *See id.* There is no question, however, that deportation is a penalty legislatively imposed as a consequence of appellant's conviction of misdemeanor sexual abuse of a child.

For the foregoing reasons, I agree with Judge Thompson's opinion for the court that because appellant was entitled to a jury trial, his conviction following a bench trial must be reversed.

FISHER, *Associate Judge*, dissenting:  According to the majority, a citizen charged with misdemeanor sexual abuse of a child does not have a right to a jury trial, but a noncitizen charged with the same offense does.  Before I accept such a startling result, I would like to see more cogent proof that the prospect of removal (even the certainty of removal) is legally sufficient to overcome the presumption that the crime is not a "serious" offense to which the right of trial by jury attaches. *Padilla v. Kentucky*, 559 U.S. 356 (2010), clearly does not compel this conclusion because it says nothing about the right to a jury trial.

In *Blanton*, the Supreme Court held that a defendant charged with an offense carrying a maximum prison sentence of six months or less is entitled to a jury trial "only if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 543 (1989).  It will

be a "rare situation" where this happens. *Id.* The Supreme Court has not addressed whether the immigration consequences of a criminal conviction qualify as "additional statutory penalties" that transform a petty offense into a serious one. That question should be more rigorously examined.[1]

*Padilla* describes "deportation [as] an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *Padilla*, 559 U.S. at 364 (footnote omitted). Nevertheless, the Supreme Court acknowledged, "it is not, in a strict sense, a criminal sanction." *Id*. at 365. The key question for us—one that *Padilla* does not address—is whether deportation or removal is the type of penalty that counts for purposes of determining the right to a jury trial. I think it does not. Deportation or

---

[1] When applying other constitutional protections, the Supreme Court has deemed it "well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment." *Mahler v. Eby*, 264 U.S. 32, 39 (1924). As a result, courts have held that removal from the United States does not implicate the constitutional prohibitions against *ex post facto* laws, *Harisiades v. Shaughnessy*, 342 U.S. 580, 594-95 (1952); double jeopardy, *De La Teja v. United States*, 321 F.3d 1357, 1364-65 (11th Cir. 2003); or cruel and unusual punishment, *Eid v. Thompson*, 740 F.3d 118, 126 (3d Cir.), *cert. denied*, 135 S. Ct. 175 (2014), because deportation is not a criminal punishment. The Supreme Court has also held that evidence obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures cannot be excluded from deportation proceedings, recognizing that "[t]he purpose of deportation is not to punish past transgressions . . . ." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) ("While the consequences of deportation may assuredly be grave, they are not imposed as a punishment . . . .").

removal is not part of the criminal penalty. It is, rather, a consequence of abusing the privilege of living in this country.

We have addressed this question in three previous cases, each time rejecting the argument. *Foote v. United States*, 670 A.2d 366, 372 (D.C. 1996) ("[T]he remedies which Foote seeks to treat as criminal penalties could be imposed only in hypothetical civil or administrative proceedings (*e.g.*, eviction, forfeiture of assets, deportation or exclusion, driver's license revocation)."); *Olafisoye v. United States*, 857 A.2d 1078, 1084 (D.C. 2004) ("[A]dministrative deportation proceedings do not raise an otherwise petty offense to the level requiring a jury trial."); *Fretes-Zarate v. United States*, 40 A.3d 374, 374 (D.C. 2012) (post-*Padilla* decision applying plain error standard of review and rejecting defendant's argument "that she had a constitutional right to a trial by jury for [simple assault] because a conviction subjects her to deportation under federal immigration law").

My colleagues rely much too heavily on *Padilla*. The Supreme Court's decision to abandon the "collateral versus direct distinction" when discussing the consequence of deportation undoubtedly means that we likewise should avoid those labels. But that semantic reform does not automatically invalidate the jury trial cases in which we employed such distinctions. And it should not obscure the fact that *Padilla* did not purport to address the question presented here. It is one

thing to say (as *Padilla* did) that a lawyer is required to assist her client in understanding the consequences the client will face if he pleads guilty (regardless of whether those consequences are called "collateral" or "direct"). It is quite a different matter to conclude that the consequence of deportation transforms a petty offense into a serious one.

That removal will be a consequence if one is convicted of a certain crime does not mean it is a *punishment* that overcomes the presumption that the charge is a petty offense. "Primary emphasis . . . must be placed on the maximum authorized period of incarceration." *Blanton*, 489 U.S. at 542. Even the consequence of actual incarceration does not necessarily count as part of the punishment when determining whether a jury trial is required. For example, in *Brown v. United States*, 675 A.2d 953 (D.C. 1996), the defendant's conviction of a new offense led another judge to revoke his probation for a prior conviction, and he was sentenced to serve an additional 120 days in prison. Brown argued that this added punishment entitled him to a jury trial. We rejected that argument, holding that "[t]he fact that this revocation was triggered by the present offense does not make the additional 120 days in prison part of the punishment for this second offense." *Id.* at 955. Similarly here, removal may have been triggered by the criminal conviction, but that causal connection does not make removal part of the punishment for the crime.

It has mattered to us before, and it should matter still, that removal is not part of the criminal process. It is not within the power of the trial judge to impose that consequence. *See Foote*, 670 A.2d at 372 (pointing out that "these sanctions and remedies [including "exclusion or deportation from the United States"] are not punishment for violations of the drug possession or PDP statutes, and the trial judge had no authority to impose them as part of Foote's sentence").

Moreover, the fact that we are dealing here with two different legislatures makes it awkward, at best, to honor *Blanton*'s command that we inquire whether the "additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." 489 U.S. at 543. The immigration laws are enacted by Congress, while the offense at issue here was created by the Council of the District of Columbia.

The government argues that we should focus only on the penalties assigned by the Council. The majority dismissively sidesteps this difficult question.[2]

---

[2] This is a difficult question because Congress has plenary power to legislate for the District of Columbia and may enact our criminal laws. U.S. Const., art. I, § 8, cl. 17. I thus do not question Congress's power to enact a penal statute providing that any noncitizen found guilty of misdemeanor sexual abuse

(continued…)

Maj. op. at 27-28 n.31.  But the "same legislature" argument mattered to us in *Brown*, where the defendant argued that the crime of drug possession was a "serious" offense becaucue federal law punished the equivalent offense by a maximum penalty of one year in prison.  We concluded that "[t]he question is not whether some other legislative authority, such as Congress, considers an offense 'serious,' but whether the Council of the District of Columbia does so." *Brown*, 675 A.2d at 955.[3]

The Supreme Court has never suggested that the identity of the defendant changes the seriousness of the offense.  To be sure, a recidivist may be entitled to a jury trial when a first offender would not be, but that is because the penal statutes expressly subject him to a longer period of incarceration.  In other words, a

---

(…continued)
shall be removed from the country as part of the punishment for committing that crime.  But that is only a theoretical possibility.  Congress has not purported to do so here.

[3] *See also Amezcua v. Eighth Judicial Dist. Ct.*, 319 P.3d 602, 605 (Nev. 2014) (potential federal immigration consequences "are not relevant because they do not reflect a determination by the Nevada Legislature that first-offense domestic battery is a serious offense"), *cert. denied*, 134 S. Ct. 2895 (2014); *cf. State ex rel. McDougall v. Strohson*, 945 P.2d 1251, 1256 (Ariz. 1997) (in determining whether defendant has right to jury trial under Arizona Constitution, Arizona courts have traditionally "look[ed] only to the consequences of conviction under Arizona law"; "[W]e do not consider the risk of deportation in determining whether the defendant is entitled to a jury trial on the state charge.").

recidivist is deemed to have committed an aggravated form of the offense—in essence, a *different* offense with a different maximum sentence.

Apart from being unprecedented, the majority's analysis enormously complicates the practice of criminal law. "Immigration law can be complex, and it is a legal specialty of its own." *Padilla*, 559 U.S. at 369. Under the majority's precise holding, the determinative question is whether the conviction would be treated as an aggravated felony—it is the certainty of deportation, not exposure to the risk, that matters. And the reservation of judgment found in footnote 33 of the majority opinion signals that issues of immigration law will become the central focus of criminal litigation whenever a noncitizen has been charged with an offense that ordinarily does not require a trial by jury. Trial judges and practitioners of criminal law will have to acquire the expertise to make these judgments. I would not add this complexity unless convinced that the Supreme Court has required it.

I respectfully dissent.